# Illinois Official Reports

## Appellate Court

**_People v. Tuduj_, 2014 IL App (1st) 092536**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOM TUDUJ, Defendant-Appellant. |
| | |
| District & No. | First District, Fifth Division<br>Docket No. 1-09-2536 |
| | |
| Filed<br>Rehearing denied | March 21, 2014<br>April 23, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction and sentence for the first degree murder of his employer following a negative performance review and for disarming a peace officer, the appellate court affirmed the trial court's judgment after rejecting defendant's contentions that the prosecution failed to present any evidence that defendant was not involuntarily intoxicated as a result of the Ambien he had taken, that his counsel were ineffective in not requesting a second fitness hearing and that the trial court's failure to *sua sponte* order a second fitness hearing was an abuse of discretion. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-13746; the Hon. Jorge Luis Alonso, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Caroline E. Bourland, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE PALMER delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant Tom Tuduj was found guilty of first degree murder and disarming a peace officer. Defendant was sentenced to a term of 40 years' imprisonment for murder and to a consecutive term of 5 years' imprisonment for disarming a peace officer. On appeal, defendant contends that: (1) the State failed to present evidence that defendant was not involuntarily intoxicated; (2) his attorneys were ineffective for failing to request a second fitness hearing and the trial court abused its discretion by failing to *sua sponte* order a second fitness hearing; (3) the trial court abused its discretion and denied defendant a fair sentencing hearing when it declined his attorneys' request for a continuance prior to the sentencing hearing; and (4) defendant received an excessive sentence. We affirm.

¶ 2     Prior to trial, defense counsel asked the court for an order allowing defendant to be given a psychiatric and psychological evaluation. The State had no objection and the trial court granted the request. After the State received the defense psychiatric reports, it requested that defendant be evaluated for his fitness to stand trial. Defendant was later evaluated by a psychiatrist, Dr. Andrew Kulik, and a psychologist, Dr. Christofer Cooper, of Forensic Clinical Services. Both doctors submitted reports concluding that defendant was fit to stand trial and legally sane at the time of the offense.

¶ 3     At a hearing on April 2, 2008, the prosecutor told the court that the doctors "on both sides" agreed that defendant was fit to stand trial and that neither the State nor the defense had a *bona fide* doubt as to defendant's fitness. Defense counsel responded, "I don't believe that we do, Judge, but since the issue was raised, we thought we should probably spread that of record."

¶ 4     At a hearing on April 25, 2008, defense counsel told the court that the defense was investigating whether defendant's actions on the day of the murder were caused by defendant having been prescribed Wellbutrin (an antidepressant) and Ambien (a sleep aid). Defense counsel stated that the defense investigation indicated that these medications likely caused defendant to commit the crime and raised the possibility of an involuntary intoxication defense. The prosecutor later told the court that he did not believe a fitness hearing was necessary because not even the experts that were hired by the defense had found that defendant was unfit to stand trial. Defense counsel responded:

> "Your Honor, I think we can go ahead and do it with this understanding. I want to make the representation to the court that I have spent several hours with [defendant], and I'm not questioning his fitness at all; but for purposes of the record, if the court wishes to have the fitness hearing, that's fine."

In response, the court stated that "[i]n an abundance of caution, I think that that's the wise way to proceed." The prosecutor and defense then confirmed their understanding that defendant was not currently on any psychotropic medications. The parties stipulated to the expertise of the two doctors from Forensic Clinical Services who evaluated defendant and to the foundation

for the doctors' reports. Finally, the parties stipulated that both doctors would opine, to a reasonable degree of medical certainty, that defendant was fit to stand trial. The court then stated that it had read the doctors' reports and heard from counsel on each side and that it found defendant fit to stand trial.

¶ 5       At a hearing on April 2, 2009, the two attorneys representing defendant requested to withdraw from the case. Those attorneys stated that they had an ongoing disagreement with defendant over the defense strategy but that recently it had become an "absolute conflict" to continue to represent defendant. The defense attorneys told the court that defendant had long maintained that they were ineffective because defendant wanted his attorneys to hire experts regarding the defense of sleep walking as a result of having taken Ambien. Defense counsel stated that the defense had researched the issue but had not hired experts to pursue that defense. However, defendant had recently threatened to file a lawsuit against the attorneys and to "destroy [their] reputation" because they had not pursued defendant's Ambien theory. Defense counsel noted that defendant had not been on any medication since he was released from the hospital following his arrest and speculated that, although he was "not an expert," "there may be part mental illness problem in this communication too." Defendant's other attorney then addressed the court and stated that "I believe, and based on three doctors we have, that Tom is bipolar and he is refusing medication at jail." Defense counsel stated that the doctors hired by the defense believed defendant should be on medication and that, according to one defense expert, "long *** diatribes" that defendant had written to the State's experts were evidence that defendant was in a "hypermanic state." According to defense counsel, defendant "broke into a rap" during a recent visit at jail and told his attorneys he would not allow them to call any witnesses to say he was mentally ill. Counsel believed that defendant would understand what his attorneys "were talking about" if he was medicated. Counsel disagreed with the State's contention that defendant was simply trying to delay the proceedings, to which the court responded, "he (defendant) wouldn't be the first defendant who wanted to sit in Cook County Jail forever as opposed to go [sic] to trial." Defense counsel then stated that "there's probably a real fitness issue here, too, but knowing the system, [defendant] probably would come back fit."

¶ 6       Defendant personally addressed the court during this hearing. Defendant said he wanted his attorneys to withdraw but that he did not want to represent himself and had not hired another lawyer who was ready for trial the following Monday. Defendant confirmed his understanding that the case was 2½ years old and set for trial and that the victim's relatives were traveling from outside of the country to be present for trial. Defendant told the court that he wanted his attorneys to pursue a theory that the side effects of the mixture of drugs he was allegedly taking, including Ambien, caused him to commit the crime while sleepwalking. The court asked the defense attorneys if they had researched this issue. Defendant's attorneys responded that they had done so and they were not proceeding with an Ambien defense based upon the information they received from the experts. Defense counsel also explained that defendant believed they would receive different information if they spoke to "other experts in the field."

¶ 7       Defendant again addressed the court and explained his concern about the experts that had been retained by his attorneys and the defense they intended to present. The trial court observed that defendant had "very talented, very experienced" attorneys who were the "best of the best here in Cook County." When asked if they were ready for trial, defense counsel stated "we are ready, Judge, as ready as lawyers can be who ha[ve] a client who wants us to withdraw

from the case." The court stated that defendant was engaging in "dilatory tactics" to delay the case on the eve of trial, that the issue between defendant and his attorneys was one of "strategic disagreement" and that it did not believe that there was any need to get another attorney involved. The court further noted that the defense had looked into the issues defendant wanted them to raise and that the case was over two years old and there had been "numerous continuances granted to look at these issues." Accordingly, the court denied defendant's attorneys' motion to withdraw. The court also observed that the case had only been before it for a few court dates, after having been recently transferred from another judge's call, but that "today and based on my observations on the last court dates, it is clear to me that [defendant] understands where he is, what he is doing, and that he is here in the courtroom and that he is understanding what I'm saying and is able to express himself to me here in court."

¶ 8        At trial, the State first called Christopher Haase, who testified that he worked for the victim, Gary Poter, at Poter Construction and Development at the time of the incident. On the morning of May 16, 2006, Haase heard a noise from the victim's office and went to investigate. Haase saw defendant's left hand on the victim's neck and the victim coated in blood from the neck down. The victim yelled for Haase to get defendant off him, so Haase grabbed defendant from behind and pulled him away from the victim. The victim took two steps before falling down. While Haase struggled with defendant, office coworkers Jim Koback and William Toby Sandier came to help. Another employee called 911 and the police took defendant into custody. Haase testified that the murder weapon was one of the office kitchen knives. He noted that on the day before the incident, defendant had a performance evaluation and defendant looked visibly upset afterward. Haase did not notice anything unusual about defendant's demeanor in the days leading up to the review.

¶ 9        William Toby Sandier testified consistently with Haase. Additionally, Sandier said he had a conversation with defendant after his performance review on May 15, 2006. Defendant told Sandier that he had to take a pay cut and lost his title of chief estimator. The next morning, Sandier stopped by defendant's office to chat with him. Sandier said they had a normal conversation and he did not notice anything unusual or bizarre about defendant's demeanor. About 45 minutes after Sandier started working, he heard a commotion down the hall and a yell for help from Jim Koback. Sandier found Koback and Haase restraining defendant against the wall. Blood was everywhere. Another employee, Tim Walsh, was applying pressure to the victim's chest. Sandier took over caring for the victim until the paramedics and police arrived.

¶ 10        James Koback corroborated Haase's and Sandier's testimony. Koback added that defendant was always worried about being fired and that he was inadequate at his job.

¶ 11        William Sattler, another employee, testified that he worked with defendant on a daily basis and noted that defendant was a quiet man. During the three months defendant worked at Poter Construction and Development, defendant had expressed to Sattler that he experienced work-related stress.

¶ 12        On the day of the incident, Sattler had a meeting with the victim at 7:30 a.m. for about 30 minutes. When Sattler left the victim's office, he saw defendant enter it. Sattler's office was located next to the victim's and, not long after Sattler settled into his desk, he heard the victim scream. Sattler peered into the victim's office to see someone tending to the victim and, at one point, heard someone scream that defendant had stabbed the victim. Sattler went down the hall to assist in making a 911 call.

¶ 13        Tim Walsh testified consistently with the State's witnesses. Walsh initially tended to the victim, but when Sandier took over, Walsh left to receive the paramedics and the police.

¶ 14    Tamela Augusta, defendant's administrative assistant, testified that she shared an office with defendant. She said defendant was stressed out and very angry after his performance evaluation. Augusta stated that defendant had said, "I can't believe Gary cut my [expletive deleted] pay, and how am I going to be able to pay my [expletive deleted] mortgage." Augusta had never seen defendant as angry as he was after his performance review, but defendant seemed calmer after a second performance evaluation later that same day. Defendant told Augusta that he believed everything would work out.

¶ 15    Augusta testified she was present one day when defendant passed out at his desk. Defendant was out of work for two days afterward. He told Augusta he was under a lot of stress and his doctor told him he had a panic attack. Augusta noted that defendant seemed normal and relaxed after that and did not notice irrational behaviors. Defendant told Augusta he was on an herbal medication, St. John's wort, to help calm his nerves and to sleep. On the morning of the incident, Augusta noticed that defendant had a blank look on his face, inconsistent with his past facial expressions while at the office.

¶ 16    Officer Michael Lappe testified that on May 16, 2006, he received a call about a stabbing at 5440 North Cumberland Avenue. When Lappe arrived, he assisted in placing defendant in custody. Defendant followed the officer's direction and did not resist. Lappe read defendant his *Miranda* rights but defendant did not acknowledge or respond to him.

¶ 17    Officer Hubert Rounds, a forensic investigator for the Chicago police department, testified that he and his partner, Zbigniew Niewdach, were assigned to investigate a crime scene at 5440 North Cumberland the morning of May 16, 2006. The victim's office was disheveled and in disarray. There was blood on the floor, walls, desk tops and counter tops. The officers collected a knife that was broken into two parts.

¶ 18    Rounds went to the police station, where he inventoried defendant's clothing and took pictures of defendant in the interview room. While in the interview room, defendant lunged toward Round's revolver but was restrained by other detectives. Defendant said, "I want to die[,] *** I want to kill myself."

¶ 19    Detective Daniel Gillespie testified that he was working as a police officer with Chicago's Area 5 homicide team on May 16, 2006. Gillespie was called to the scene after the victim and defendant were removed. He interviewed the victim's employees and learned about defendant's performance evaluation, his reaction to his salary reduction, his fainting spell and his concerns about being fired. About two hours after the stabbing, Gillespie went to the police station to question defendant. Gillespie said that defendant did not appear confused when he was read his *Miranda* rights and indicated he understood. Gillespie interviewed defendant for 2½ hours. Defendant was slow in responding to questions about the stabbing but was immediately responsive when the detective offered him water, food and cigarettes. Gillespie noted that defendant became more responsive after a couple of hours of questioning.

¶ 20    On cross-examination, Gillespie agreed that he did not ask defendant questions about his mental health. Gillespie explained that since defendant was responsive to questions about food and water, he believed defendant understood the questions but chose when to answer and what to answer. Gillespie said that defendant told him he was on antidepressants and the medication was having an effect on him. He claimed not to remember what happened, repeatedly asked what happened and said that he "did something bad." Defendant told Gillespie he was angry about his performance evaluation. Defendant said he took two pills the morning of the incident and the last thing he remembered was arriving at work, then going to the police station.

Defendant also talked about his ex-wife's "spirits," said that her anger was in him, and that she provoked him to do things he would not normally do.

¶ 21 Gillespie further testified that defendant admitted his intention was to hurt the victim and that he was mad at the victim for reducing his salary. Defendant told Gillespie he grabbed a knife from the office kitchen, hid it in his sleeve and walked to the victim's office. Defendant admitted to stabbing the victim in the chest and said that he "[expletive deleted] up." Defendant blamed it on his medications and said his medication may have been at home or in his office. Gillespie testified that the police checked for medication on defendant's desk but found none. Gillespie also went to defendant's home to look for medication, but no one was home. Gillespie said no toxicology report was ordered for defendant because he was not sure if defendant was telling him the truth.

¶ 22 The parties stipulated that Dr. Nancy Jones, an expert witness in forensic pathology, performed an autopsy on the victim's body on May 16, 2006. Jones would testify that the victim died as a result of multiple stab wounds and the manner of his death was homicide.

¶ 23 The parties stipulated that Kelly Ashton, an expert in forensic biology, would testify that blood samples preserved from both the knife and defendant's shirt were forwarded to the DNA unit for further analysis.

¶ 24 The parties stipulated that Jennifer Bell, an expert in the field of DNA analysis, would testify that two human DNA profiles found on the knife and defendant's shirt matched the DNA profiles of the victim and defendant.

¶ 25 Defendant's first witness, Dr. Orest Wasyliw, was qualified as an expert in psychology and neuropsychology. Defendant's attorneys asked Wasyliw to assess defendant and determine if he was suffering from a mental disorder. Wasyliw performed psychological testing on defendant, conducted a clinical interview and reviewed other experts' reports. He also reviewed the video of defendant's interrogation and hospital records, including records from Cermak Hospital, where defendant was first evaluated after his arrest. Wasyliw's tests did not show evidence of malingering though the doctors at Cermak Hospital identified three instances where defendant may have been malingering. Wasyliw diagnosed defendant with a mood disorder and said defendant displayed both depressive and manic symptoms. Wasyliw said that these two symptoms indicated a likelihood of bipolar disorder, but he did not diagnose defendant with bipolar disorder.

¶ 26 Wasyliw said defendant had a history of alcohol abuse and defendant reported having derogatory auditory hallucinations, memory problems and physical symptoms, including muscle twitching. Wasyliw also learned that defendant fainted at his workplace because he was stressed and not sleeping well. After defendant's fainting spell, he was prescribed three medications: Wellbutrin, an antidepressant; Ambien, a sleep aid; and propranolol or Inderal, a medication for high blood pressure and hypertension.

¶ 27 Wasyliw testified he believed that, at the time of the homicide, defendant was in a drugged state that prevented him from conforming his behavior to the requirements of law. Wasyliw failed to state this diagnosis in his report and acknowledged that he had no formal medical school training and no training in the particular medications prescribed to defendant. Wasyliw also acknowledged that the doctors at Cermak Hospital did not diagnose defendant with neurotoxicity, a mood disorder or psychosis. Instead, the doctors at Cermak Hospital diagnosed defendant with adjustment disorder, and defendant's medical records indicated he was suffering from depression, anxiety and poor sleep.

¶ 28    On cross-examination, Wasyliw agreed that defendant's statements may not have been trustworthy since his answers about his drinking problems and hallucinations had been inconsistent. Wasyliw also agreed that defendant may have rehearsed lies about his symptoms because he had Internet printouts of the symptoms. But, Wasyliw stated that defendant gave statements relating to his disorder before conducting Internet research.

¶ 29    Dr. Lisa Rone was qualified as an expert in clinical psychiatry and testified on behalf of defendant. She admitted that she has never before worked on an involuntary intoxication defense. Dr. Rone reviewed various documents, including police records, witness reports, medical records, defendant's interrogation video and testing reports from other experts, and she met with defendant for three hours. Defendant told Dr. Rone about his paranoia concerning his performance evaluation and said he was upset about his salary reduction. Defendant also reported that he was sleep deprived and took Ambien the night before the homicide. Before the homicide, defendant experienced hallucinations and said he did not remember anything about the incident. Dr. Rone said defendant's disoriented demeanor in the interrogation video was consistent with his story.

¶ 30    Dr. Rone opined that defendant was suffering from a mistreated bipolar disorder on the day of the homicide. She said defendant's primary care doctor misdiagnosed defendant with depression and anxiety, and inappropriately prescribed the medication Wellbutrin XL. The Wellbutrin could have caused defendant to "switch" from depression to mania. Dr. Rone explained that defendant's mood disorder required a mood stabilizer before taking an antidepressant. Dr. Rone believed that defendant's bipolar condition had worsened and the Wellbutrin exacerbated his paranoia. Dr. Rone concluded that at the time of the homicide, defendant was unable to conform his conduct to the requirements of the law and that Wellbutrin exacerbated his illness. But, Dr. Rone admitted that neither her report nor Dr. Wasyliw's report stated defendant was unable to conform his conduct to the requirements of law. Additionally, Dr. Rone only believed Wellbutrin and not Ambien had an effect on defendant's bipolar state. Although it was unclear whether defendant took Wellbutrin every day, Dr. Rone stated that the drug would still be in defendant's blood stream two days later.

¶ 31    Dr. Rone found defendant's accounts of when he took his medication inconsistent but said the inconsistencies could be attributed to memory problems. Dr. Rone deduced from Dr. Wasyliw's memory tests and from defendant's demeanor that he was in a "confusional state" during the police interrogation. But, defendant began to come out of this confusional state when he started giving the police a more detailed account of the stabbing.

¶ 32    On cross-examination, Dr. Rone admitted that she based her diagnosis on defendant's self-reports and a manic episode defendant had in 2005. Dr. Rone admitted that her report erroneously stated that a doctor at Cermak Hospital had diagnosed defendant with bipolar disorder. She testified that Wellbutrin may cause a manic episode in a bipolar patient, but testified that defendant had not shown manic symptoms during his police interrogation. Dr. Rone agreed that defendant could recall several benign events on the day of the homicide yet claimed an inability to recall the homicide itself. She also agreed that defendant spoke softly to the detectives during his interrogation but was able to raise his voice when he wanted something.

¶ 33    Dr. Rone testified that bipolar disorder is a chronic disease that does not go away. She acknowledged that defendant has been in the general population since he left Cermak Hospital and was not on medication at the time of the trial. While defendant now blames the side effects of Ambien for his behavior, Dr. Rone believed Ambien was not responsible for defendant's

actions. Dr. Rone admitted that Ambien may be a factor as to why defendant was more "out of it" on the DVD, but she did not think it exacerbated his bipolar illness. Though Dr. Rone acknowledged that Ambien should not be mixed with antidepressants, she stated that psychiatrists, including herself, have prescribed Ambien and antidepressants as sleep aids.

¶ 34 Dr. William Gilmer, an expert in clinical psychiatry and pharmacology, testified next for defendant. Gilmer reviewed all available reports on defendant but did not meet with him. Gilmer testified consistently with Dr. Rone and said that defendant suffered from a bipolar disorder exacerbated by Wellbutrin. He explained that antidepressants typically take 12 to 16 weeks to have full therapeutic effect but antidepressants can have a more immediate effect on bipolar patients. Even an introductory amount of Wellbutrin can cause a "mood cycle" or "switch" in a bipolar person. Gilmer admitted that it is more difficult to diagnose a patient who is abusing alcohol or drugs because those substances may influence one's emotional state.

¶ 35 Gilmer testified that defendant's actions were consistent with Dr. Rone's diagnosis. He believed that defendant's conduct during the homicide, including obtaining and concealing the knife, is consistent with a paranoid state. He saw no evidence of malingering and reported that defendant exhibited paranoid symptoms during his interrogation video. Although defendant stated that he made a bad choice, Gilmer did not believe defendant had a choice.

¶ 36 Gilmer said defendant's recitation of his past mistakes was a guilty rumination that can be seen in someone who is psychotically depressed. Gilmer also stated that Dr. Cooper, the State's witness, incorrectly diagnosed defendant with a mood disorder rather than bipolar disorder. Gilmer said defendant exhibited bipolar symptoms with Cooper. Cooper disagreed with Dr. Kulik's opinion, which attributed defendant's paranoia to cocaine use. Dr. Gilmer said that cocaine is a stimulant, and together with Wellbutrin, will cause someone to be psychotic.

¶ 37 Gilmer concluded that defendant had bipolar disorder. Gilmer admitted that he never spoke to defendant. Gilmer also admitted that his written report did not state that defendant was bipolar or whether defendant was able to conform his conduct to the law. Gilmer admitted he formulated his opinion after writing the report and speaking with defense counsel. Gilmer said a clinical interview with defendant was unnecessary to determine his mental state and his review of all the reports and documents was sufficient.

¶ 38 Gilmer believed that Ambien was unrelated to the homicide and said the Wellbutrin exacerbated defendant's worsening mental condition. Gilmer agreed that defendant told the police he took two pills the morning of the incident but it is unclear what pills he took. Gilmer said it was unlikely that defendant took Ambien that morning.

¶ 39 Gilmer said he based his bipolar diagnosis on Dr. Rone's erroneous report that a doctor from Cermak Hospital had diagnosed defendant with bipolar illness. When confronted with Rone's error, Gilmer stated that his bipolar diagnosis of defendant was based on the symptoms defendant reported to Cermak Hospital. Gilmer agreed that Cermak Hospital's diagnosis was probably more reliable since it was made closer to the time of the homicide and Rone did not meet with defendant until about a year after the incident. Gilmer agreed that the Cermak Hospital records from the day after the stabbing indicated defendant was alert and cooperative and that he denied having hallucinations, delusions, paranoia and mental confusion. But, Gilmer suggested that Cermak Hospital may not have recognized defendant's psychotic symptoms or performed an adequate evaluation.

¶ 40    Gilmer agreed that professional ethics guidelines caution psychiatrists to conduct personal evaluations of patients before testifying. Gilmer admitted that he worked on one other criminal case 10 years before defendant's case and defendant's was the only case involving a videotaped interrogation. Finally, Gilmer admitted that he had never "seen" a person who committed a murder because of an ingestion of medication.

¶ 41    Defendant testified that he began working at Poter Construction in early 2006 as a probationary employee. Defendant said he had a good mentor-mentee relationship with the victim but was worried about getting fired. On May 8, 2006, defendant went to see Dr. Kal-Lipski because he fainted at work. The doctor gave defendant Ambien, Wellbutrin and propranolol. The doctor did not give defendant any information on the side effects of the drugs.

¶ 42    On May 15, 2006, defendant had his three-month performance evaluation with the victim. Defendant testified he had difficulty communicating with the victim and his salary was reduced from $62,000 to $42,000 a year. Defendant said that he probably told his coworker about his pay cut but denied having said "[expletive deleted] Poter." Defendant admitted the pay cut upset him but he was happy and relieved when the victim raised his salary to $52,000 later that day.

¶ 43    Between May 8 and May 15, after defendant began taking the medications, he began to experience side effects that made him feel "weird" and "different." He began to hear voices telling him to kill himself and he had violent nightmares about his ex-wife and the victim. Defendant blamed these side effects on the medication and said that Ambien was twice as powerful as LSD. He had no recollection of his police interrogation or of going to work on the day of the incident. Defendant had no memory of events occurring between the time after his performance evaluation on May 15 and when he woke up in the psychiatric ward at Cermak Hospital.

¶ 44    At Cermak Hospital, defendant was given antipsychotic medication that made him feel worse, so he began to refuse them. Defendant denied concocting a defense based on his research of Wellbutrin, Ambien and propranolol. Defendant testified that Wellbutrin creates thoughts of suicide and stated that Ambien is an hypnotic sedative, which may cause sleepwalking, sleep driving and other complex behaviors. Defendant further stated that propranolol, a memory-erasing drug, was responsible for his inability to recall what happened. Defendant criticized Dr. Gilmer's failure to recognize Ambien's side effects and also criticized Dr. Rone, his defense attorneys and the prosecutors. Defendant offered his own research to show that the drugs he took have killed many people. Defendant acknowledged his own lack of experience in chemistry and pharmacology but was permitted to present his "theory" of what occurred on the day of the incident. He prepared a chart to summarize his research and concluded that what caused the incident was a combination of hypnosis, sleepwalking, noninsane automatism and nightmare terrors.

¶ 45    Defendant disagreed with his defense counsel's strategy and denied having mental illness not caused by medication. He testified there was a conspiracy among pharmaceutical companies in maximizing their profit by dispensing dangerous drugs without adequate warnings. He said he should have been informed of the side effects of the medication he took and that his attorneys should have ordered a DNA test to determine how the drugs metabolized in his body. He also blamed Dr. Kal-Lipski for mixing Wellbutrin and Ambien and neglecting to consider his history of alcohol abuse. He said that he always took Ambien at bedtime and that it made him sleepwalk and made it difficult to function at work. Defendant took Wellbutrin and propranolol once a day but may have missed a dose of Wellbutrin. He believed

that he took Wellbutrin the morning of the homicide and blamed the murder on the combination of drugs he took.

¶ 46    Dr. Christofer J. Cooper, an expert in forensic psychology, testified in rebuttal for the State. Cooper performed clinical tests on defendant, interviewed him three times and reviewed various documents, including police and hospital records, doctors' reports and defendant's interrogation videotape. Cooper found defendant to be talkative, responsive, alert and oriented. Defendant blamed the murder on the medications he was prescribed. Cooper said that defendant had no psychiatric history before May 2006 and disagreed with Dr. Rone's belief that defendant suffered a manic episode in 2005. Cooper stated that a definitive diagnosis cannot be made if the person is regularly abusing alcohol and marijuana or other drugs. In addition, he said that defendant's fainting incident on March 27, 2006, was treated medically and not psychiatrically or psychologically. Defendant reported that he was fatigued and possibly weak because he was on the Atkins diet and had lost weight. But a transportation note from the Chicago fire department to the hospital defendant was taken to documented that defendant had a panic attack. Hospital records from the fainting incident showed that defendant complained of numbness in both hands and was hyperventilating, dizzy and groggy.

¶ 47    Defendant told Cooper that he was taking Wellbutrin and propranolol in the morning and Ambien in the evening. Defendant claimed to have memory problems during the days he took the drugs but remembered the day before the homicide, May 15, 2006, when defendant was scheduled for his performance review. Defendant provided a detailed account of the events on May 15 and Cooper believed defendant displayed selective memory. Defendant's account of May 15 showed he had good cognitive capacities and good verbal abilities because defendant was able to meet with his boss twice and successfully renegotiate his salary during their second meeting. But defendant said he had no memory of the homicide or his statements to the police. Cooper said that defendant could not recall if he took his medications the morning of the incident.

¶ 48    Cooper stated that according to Cermak Hospital records, there was no evidence defendant had major confusion or disorientation. Cooper also believed that defendant displayed signs of malingering at Cermak Hospital. For example, defendant was observed to be laughing and socializing with another detained person, but when his name was called for an interview, defendant's demeanor changed to express "suddenly blunt affect and psychomotor retardation." Cermak Hospital records also noted that defendant may have complained of his symptoms to avoid detention in jail.

¶ 49    As to defendant's interview with Detective Gillespie, when defendant refused to verbalize answers to the detective's questions or claimed he had no memory of the incident, Cooper believed that defendant was simply choosing not to answer the questions. Cooper concluded that there was no evidence during the video that defendant was having a severe bipolar episode.

¶ 50    Cooper's psychological testing showed that defendant did not have memory problems. Cooper believed that at the time of the alleged offense, defendant was legally sane and had the ability to appreciate the criminality of his actions. Cooper diagnosed defendant with an adjustment disorder with mixed anxiety and depressed mood, alcohol abuse, cannabis abuse and a personality disorder with narcissistic features. But, Cooper did not examine the influence of medications or toxicity. Instead, he assessed defendant's general mental state at the time of the alleged offense. Cooper believed that the facts of the case, including how defendant got and

concealed the knife, showed that defendant was goal-directed and was not suffering from a severe mental illness at the time of the offense.

¶ 51    On cross-examination, Cooper admitted that some of defendant's statements and actions are consistent with psychiatric symptoms, including grandiosity and paranoia. He also agreed that the types of questions the officers asked defendant about his performance review suggested a motive for the murder. Cooper said he and Dr. Kulik did not discuss the effects of the medications or potential effects of the medications in their reports, even though they were aware defendant was prescribed psychotropic medication.

¶ 52    The State's final witness was Dr. Andrew Segovia Kulik, an expert in forensic psychiatry. Kulik reviewed reports and conducted a clinical interview with defendant. During Kulik's interview, defendant did not show signs of psychosis, mania or mixed mania. Defendant presented documents and literature to Kulik and told him his defense was that the medication caused him to commit the homicide. Kulik concluded that defendant did not meet the criteria for a major depressive disorder, defendant was able to appreciate the criminality of his actions at the time he killed the victim, and defendant did not suffer from a severe mental illness or defect.

¶ 53    Kulik testified that the medications prescribed to defendant do not take effect until they pass through the digestive tract. Defendant was given a minimum dosage of time-released Wellbutrin, which works over a period of approximately 24 hours. Defendant told Kulik that he took his medications as prescribed, except Wellbutrin, on May 15 or May 16, 2006. Kulik testified that defendant had a clear memory of May 15 but defendant could not recall the other days while he was on the medication. Defendant did not remember making angry statements about his review to Augusta on May 15. Defendant stated that after taking the Wellbutrin, he had difficulty and would find himself going to sleep and believing that he was at work. Defendant also experienced visual and auditory hallucinations. Defendant told Kulik he could not recall the specifics of the homicide and he was in a dream-like state.

¶ 54    Kulik stated that there was nothing establishing a link between defendant's symptoms and the homicide. There was no link between the psychosis defendant described and the victim because the victim was not perceived as a threat. Kulik believed that Cermak Hospital's diagnosis of adjustment disorder was accurate. Cermak Hospital records indicated that the doctors did not believe defendant had a severe mental illness. The records also noted a pattern of malingering. Kulik added that people who are manic cannot function well enough to go to work because they are psychiatrically debilitated. Defendant was able to go to work, hide a knife in his sleeve, and go to Poter's office, and he did not randomly choose another person to kill. Kulik also found no evidence of mania or psychosis in defendant's interrogation video. Kulik believed that defendant's attempt to take an officer's gun during his interrogation was an impulsive but goal-directed act and did not show confusion or disorientation.

¶ 55    Kulik testified that if Wellbutrin were given to a bipolar person, it would push the person into a manic state. But, Kulik did not see signs of mania, psychosis or intoxication during defendant's interrogation. He agreed that the best indication of intoxication would have been a toxicology test, which was not performed. Kulik concluded that defendant had an adjustment disorder that was resolved by the time he saw defendant. Kulik also concluded that defendant was able to understand and appreciate the criminality of his actions at the time of the alleged offense and did not have a severe mental illness or defect that could affect his ability to conform his conduct to the precepts of law.

¶ 56    Kulik stated that a psychiatrist generally should not give opinion testimony without first conducting a clinical interview with the patient. Dr. Kulik agreed that Ambien can cause sleep driving and sleepwalking but said that cases where such side effects occurred happened shortly after ingestion of Ambien. Kulik noted that no other expert in this case suggested defendant was sleepwalking or under the influence of Ambien at the time of the homicide. Kulik added that Ambien was unrelated to the offense and noted that defendant took Ambien the night before the murder.

¶ 57    Following closing arguments, the trial court found defendant guilty of first degree murder and disarming a police officer. The court commended the attorneys for the State and the defense for having done an "excellent job" and for the "many hours of preparation" they put into the case. After recounting the evidence presented at trial, the court found that defendant had met his burden and presented "some evidence" of involuntary intoxication but that the State had proven defendant guilty beyond a reasonable doubt, including having proven beyond a reasonable doubt that defendant was not involuntarily intoxicated. The court commented on its credibility findings and the conflicts in the testimony, including the conflict as to defendant's mental state at the time of the offense:

> "I resolved these conflicts in favor of the People. On the issues of the testimony, on these issues the testimony of the State's witnesses were more credible. Their witnesses were more unbiased. I find that they testified in a much more neutral fashion. I find that the manner in which these experts testified was very important to me and ultimately I find that the State's witnesses were more believable.
>
> The defense put together a well-developed and organized defense. They had three experts who testified as I stated. And not contesting the fact that they were highly qualified, that they were very experienced and that they were highly specialized. It was apparent in fact that they were highly respected in their profession.
>
> I note that I am not persuaded simply by the fact that the State, that the defense put on more witnesses than the defense did which they did. And I also note that I am not bound by that. Nor am I bound by the mere fact that these witnesses were more impressive in terms of their *curriculum vitae*, that their experiences were longer, that they had weightier CV's, if you will.
>
> Specifically why I make my findings regarding credibility obviously these are not the only reasons and much of it has to do with the facts of the case themselves with what I myself saw and what I've heard the experts explain. Specifically it relates to the reliability of the witnesses. I find that the defense's experts were more unreliable to a greater extent they were based upon the self-reported defendant [*sic*] and upon the reports of the defendant's sister.
>
> I would like to make it clear that I found that [defendant] was totally and completely incredible. I found that in the video he was incredible. I found that very early in the video he is faking, he is malingering, he is acting. I think that the Chicago Police Department did an excellent job once they finally got to [defendant] they did an excellent job and I think ultimately that [defendant's] downfall was simply that he was faced with who he knew, the detectives that he knew didn't believe him. He acted as long as he could ultimately he began to change his story and finally he began to tell the truth. That was the last time that he told the truth. I am not saying that everything on that video was an act. I believe that he knew exactly what happened. And I believe today he knows exactly what happened. And I believe that what we have seen since

- 12 -

then is an attempt to shift blame. I did not believe him on the video, I did not believe him on the stand.

I thought as it relates to credibility that his experts were too willing to accept and to endorse *** anything and everything that he said or that his sister said ***. And I thought to that extent that it called into question the credibility of his witnesses. I thought that in regards to their manner while testifying I thought that when compared to the State's witnesses that the defense witnesses were too unwilling to make any sort of concession and they did not admit any shortcoming or any inconsistency in their case. *** But I found especially that Dr. Wasyliw testified in that way, he did not testify in a neutral manner. And I believe that when compared to the manner in which the State's witnesses testified the manner of testifying was in favor of those witnesses who testified much more neutrally, answered questions and were not advocating, they were here to report what their findings were and seemed much more unbiased.

I believe that a critical issue in the case is this issue of motive. I say that it is critical because I believe it is through the discussion, the debate about the motive, the lack of motive, whether the motive was rational. I believe that this is where the defense experts exposed themselves in bending over backwards to make sure that there was no way he could have been unhappy about losing $10 thousand dollars or being demoted. *** To argue as these witnesses the experts for the defense all did that there is no way that could have been rational, there is no way that that could have been a motive I thought was very harmful to their credibility."

¶ 58    Defense counsel filed a motion for a new trial. When denying that motion, the trial court reiterated its findings that the State's expert witnesses were "more neutral, more open and more honest ultimately, intellectually honest in coming to their conclusion in the case." In response to the argument that a continuance should have been granted before trial, the court reiterated that defendant was being dilatory and did not want to go to trial and that the issue regarding what defense to pursue was one of trial strategy. The court also stated that defendant "was going to have the same disagreement with the next lawyer or the lawyer after that."

¶ 59    The trial court then conducted a hearing under *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). Defendant was allowed to present his *pro se* motion for a new trial and state his grievances. Defendant blamed his attorneys for not pursuing his "Ambien defense" and claimed they also failed to order a DNA test and present evidence of a drug interaction. One of defendant's attorneys explained that he did not present an Ambien defense because he did not believe it was a viable defense. Defense counsel said research showed that Wellbutrin was his best defense because Ambien would no longer be in defendant's system if he took the drug the night before the incident. Counsel learned that Wellbutrin stays in the system much longer and is a drug that should not be given to bipolar persons without mood stabilizers. The decision to forgo a DNA test was also based on expert advice stating that the test would not advance defendant's Ambien theory. The trial court denied defendant's *pro se* motion and noted that defendant's complaints pertained to matters of classic trial strategy.

¶ 60    On June 11, 2009, the day the case was set for a sentencing hearing, defendant's attorneys moved to withdraw from the case. Counsels explained that their problems with defendant had become worse and that there was a conflict with them continuing to represent defendant. One of defendant's attorneys explained that on May 27, 2009, he was informed that another attorney, Michael O'Kane, would be involved in posttrial matters and that the prosecutor had just informed defense counsel that a "mitigation packet" had been sent to the court without

- 13 -

counsel's knowledge or permission. The defense had not reviewed all of the material sent to the court but the portion they had read contained allegations about how defendant's attorneys had handled the case. Defense counsel explained that he had not spoken to defendant or his family in preparing for the sentencing hearing. Counsel stated that to proceed that day would put him in an "untenable position" and that defendant could either go *pro se* or retain O'Kane, who defense counsel believed was going to request a continuance to obtain an expert witness.

¶ 61 Defense counsel introduced O'Kane to the court. Although O'Kane previously filed a motion to appear *pro hac vice*, he explained to the court that he withdrew that motion because he did not intend to be substitute counsel but, instead, to act as additional counsel to provide "some assistance" to the defense. O'Kane said he was not prepared to handle sentencing by himself and that if the court granted defense counsel's request to withdraw, O'Kane would request a six-month continuance to obtain experts for the sentencing hearing. The State objected to continuing the case, noting that defendant had consistently attempted to delay the proceedings for the past three years and that defendant was going to have a conflict with any attorney who represented him. The prosecutor further argued that defendant had been found guilty in January and that, according to the documents defendant had not yet filed, his "expert on Ambien" would not even look at the case until September.

¶ 62 Defense counsel responded that O'Kane first contacted him on May 27 but that there was no *bona fide* reason to seek a continuance at that time. However, since that date, the packet of mitigation material had been sent without counsel's knowledge and the pleadings that O'Kane intended to file took a different position than had been taken by the defense.

¶ 63 Defendant then addressed the court and, in response to the court's questions, said that he wanted O'Kane to represent him "in the future" but that he did not currently have an attorney to represent him. The court explained to defendant that it had been six months since he was found guilty and that since that time defendant had not given anyone notice that he intended to hire a new attorney. The court asked defendant if he felt he was entitled to a six-month continuance given that the case had already been continued six months for sentencing. The court also asked defendant if he wanted to represent himself at sentencing and defendant said that he did not. Defendant said that he had only learned about O'Kane two weeks ago and reiterated his complaints about counsel's decisions to not pursue an "Ambien defense." The court told defendant that this was the same "trial strategy conflict" that had been discussed before and during trial, and defendant indicated that he understood. Defendant then asked for a six-month continuance so that his new lawyer could prepare some "collateral information." The court explained to defendant that O'Kane was not currently licensed in Illinois and that defendant was asking for a continuance when it was unclear if O'Kane would file an appearance after those six months. The prosecutor again objected, arguing that defendant had deliberately created the alleged "conflict" and noting that it was unclear whether O'Kane would even file an appearance and whether he would ultimately pursue an "Ambien defense." O'Kane then told the court that he would represent defendant if the six-month continuance was granted.

¶ 64 Defense counsel explained that his contact with defendant had been through defendant's sister, who was going to obtain the mitigation witnesses and letters. However, that communication broke down and defense counsel had not spoken to those witnesses or read all of the mitigation letters that had been submitted.

¶ 65 The court denied the motion for a continuance and explained:

"In the absence of counsel who is ready to proceed, [defendant] does not have an absolute right to a continuance. He does not have an absolute right to the attorney who he may want to choose one day. He does not have an absolute right to continue this case indefinitely.

He is manipulating the system, a manipulation that began before we even went to trial.

The motion to withdraw on behalf of [defendant's attorneys] is also going to be denied.

I'm hearing the word conflict, but I'm not hearing what the conflict is. Clearly the situation is far less than ideal. Feelings have been hurt. Communication has been broken down.

These attorneys are fine attorneys. They did more than a competent job at trial. Their advice was ignored. They presented a very good defense, a defense that made sense. We had a breakdown in terms of trial strategy that we have been talking about since before we went to trial. That sure was not going to change after [defendant] was found guilty.

So that is the situation that has become heightened. He doesn't like it. He doesn't like the fact that he was found guilty. His sister doesn't like it. They don't have to like it.

But there is not an attorney who is ready to proceed today. This is not a situation that should surprise anyone. We've been set for a while. Again, it's not because people have flown in. It's because [defendant] is manipulating the system or attempting to do so.

There isn't a hybrid representation. We are going to go forward today. And the conflict is the same conflict.

Regarding the packet of information that was filed, it is harmless, it is mitigation. Things are not proceeding the way they should between an attorney and a client and the client's family and the attorneys, but everything in here either goes to [defendant's] defense, his internet defense regarding Ambien and Ambien zombies or–which is harmless, at best, or he's got a stack–I've never seen a stack of mitigation, of letters, of pictures like this. And it is not harmful in any way. In fact, it is mitigation, mitigation regarding [defendant], [defendant's] background, [defendant's] family, his education, his work. I've got documents from college, from high school, from work, from family and friends and loved ones. There's nothing in there that his attorneys should fear.

And there are no surprises in terms of the other documents that he's tendered regarding doctor's medications, et cetera. I've been hearing all about it. And that is mostly what counsel O'Kane has put together as supplemental materials for sentencing.

So all of those motions are going to be denied. We are going to proceed with sentencing today over everyone's objections."

Defense counsel then moved for a continuance "for the record," which the trial court denied.

¶ 66 The trial court then held a sentencing hearing. In aggravation, the State presented impact statements from the victim's family as well as evidence about defendant's 2005 arrest for shooting a gun in his backyard, including that he struggled with the arresting officers. In mitigation, defense counsel presented two witnesses, defendant's sister and a long-time friend

- 15 -

of defendant. They testified that defendant was a caring and gentle person who was never violent. The trial court stated that it had read all of the letters that had been submitted on defendant's behalf. Defense counsel argued that defendant's only conviction was for unlawful use of a weapon based upon the incident in his backyard and that, prior to the murder, defendant was a hard worker who contributed to society and who was respected and loved by those who knew him. Counsel further argued that defendant had a traumatic past in which his wife cheated on him and then killed the girlfriend of her lover. As a result, defendant was required to testify against his wife. Counsel also asked the court to consider defendant's mental illness and the fact that defendant was upset about the loss of the victim's life.

¶ 67　　In allocution, defendant expressed his remorse and sorrow for the loss of the victim's life and asked the victim's family for forgiveness. Defendant stated that the victim had been a good boss from whom defendant had learned a lot. Defendant stated that he committed the crime as a result of the side effects of the "psycho-active drugs" that he had been given by a physician and that, had he been aware of those side effects, he would not have taken the medication and the victim would still be alive. Defendant vowed to do what he could while in jail "to save innocent lives and remove these controversial drugs."

¶ 68　　In announcing a sentence, the trial court stated that it had considered the arguments of counsel, defendant's statements in allocution as well as the statutory aggravating and mitigation factors. The court acknowledged defendant's lack of a criminal history and stated that it also considered the "many, many" letters and documents submitted on defendant's behalf as well as the arguments of counsel. The court found that defendant knowingly and intentionally stabbed the victim "in a fit of anger" as a result of his salary being reduced. The court stated that defendant killed an "individual who was completely blameless" and that defendant "has excuses but no true remorse." The court believed that, in terms of potential rehabilitation, defendant's "ability to deflect responsibility" made him a dangerous person and that a sentence "close to the maximum" was justified. However, the court stated that, as defense counsel pointed out, there were statutory mitigating factors such as the lack of criminal history and the fact that defendant was a "hard-working man" who was also a great son, brother, uncle and godfather. Ultimately, the court found that a sentence "right in the middle of the sentencing range" was appropriate and sentenced defendant to a term of 40 years' imprisonment for murder and a consecutive term of 5 years' imprisonment for disarming a peace officer.

¶ 69　　Attorney O'Kane subsequently filed an appearance on defendant's behalf and a motion to reconsider defendant's sentence. The motion argued, among other things, that the court abused its discretion in denying a six-month continuance because trial counsel was unprepared for the sentencing hearing. Defendant asserted that counsel should have investigated and presented additional mitigating evidence and therefore sought a new sentencing hearing. Attached to the motion were affidavits from individuals who knew defendant attesting to what they would have testified to had they been called as witnesses at defendant's sentencing hearing.

¶ 70　　In denying defendant's motion, the court responded to defendant's allegations that a continuance should have been granted and that his attorneys were ineffective during sentencing. The court stated that the situation was "less than ideal" and that defendant had tied his attorneys' hands as part of a strategy to avoid sentencing. The court believed that defendant was attempting to manipulate the system and noted that it did not have "an attorney who was ready to file his appearance and was ready to proceed" or "an attorney who was asking for a short continuance." The court was faced with a situation "where possibly counsel was going to

file an appearance possibly sometime down the road, months down the road, and I did not have any assurances that was going to happen." Therefore, the court denied the continuance "to prevent [defendant] and his family from manipulating the system more than they had." The court further remarked that defendant's attorneys "did the best they could," including cross-examining the witnesses and making a "good case for their client." The court stated that it had received all of the mitigating evidence that it should have received, albeit indirectly, that the sentence imposed was appropriate considering all of the aggravating and mitigating evidence and that "nothing that I have heard, including the affidavits that were tendered today would have changed that sentence." The court also stated that although defendant's attorneys had attempted to withdraw prior to sentencing, "their professionalism kicked in and they cross-examined witnesses, made all the points they should have made, presented what needed to be presented." Therefore, the court denied defendant's motion to reconsider his sentence. This appeal followed.

¶ 71    Defendant first contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. Defendant specifically claims that the State did not prove beyond a reasonable doubt that he was not involuntary intoxicated by the side effects of Wellbutrin at the time of the murder.

¶ 72    When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). Under this standard, a reviewing court resolves all reasonable inferences in favor of the State. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A criminal conviction will not be set aside on appeal unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 73    The Illinois statute codifying the involuntary intoxication defense provides:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2006).

¶ 74    Involuntary intoxication is an affirmative defense that exonerates an accused if the trier of fact believes the elements of the defense have been met. *People v. Hari*, 218 Ill. 2d 275, 295 (2006). The phrase "involuntarily produced" is not limited to trick, artifice or force but also includes a drugged condition caused by "an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the PDR or the package insert." *Id.* at 292-95.

¶ 75    In order to sustain a conviction for first degree murder, the State is required to prove beyond a reasonable doubt that the defendant killed the victim with the intent to kill or do great bodily harm, or the knowledge that his acts would create a strong probability of death or great bodily harm. 720 ILCS 5/9-1 (West 2006). Involuntary intoxication is an affirmative defense to murder if it "deprived defendant 'of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law.' " *People v. Redmond*, 265 Ill. App. 3d 292, 302 (1994) (quoting 720 ILCS 5/6-3(a), (b) (West 1992)). Generally, if an affirmative defense is raised, " 'then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense.' " *People v. Hari*, 218 Ill. 2d 275, 295 (2006) (quoting 720 ILCS

5/3-2(b) (West 2002)). More specifically, once a defendant has sufficiently raised the affirmative defense of involuntary intoxication, as the trial court found that defendant did in this case, the State then bears the burden of proving beyond a reasonable doubt that defendant was not involuntarily intoxicated such that he lacked substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of the law. See *Hari*, 218 Ill. 2d at 295-96. Whether defendant's intoxication was so extreme as to render him incapable of committing a knowing or intentional act is a question for the trier of fact. *Redmond*, 265 Ill. App. 3d at 302.

¶ 76    In this case the State concedes, and we agree, that defendant presented sufficient evidence through his own testimony and that of his expert witnesses to raise the affirmative defense of involuntary intoxication. Therefore, the burden shifted to the State to prove beyond a reasonable doubt that defendant was not so involuntarily intoxicated that he lacked substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of the law. See *Hari*, 218 Ill. 2d at 295-96. Defendant claims that the State failed to meet this burden.

¶ 77    The trial court heard conflicting testimony on the issue of defendant's mental state at the time of the offense. On the one hand, defendant testified on his own behalf and presented expert testimony that on the day of the homicide, he suffered from a bipolar disorder that was exacerbated by Wellbutrin and that as a result defendant was unable to conform his conduct to the requirements of the law. On the other hand, the State presented expert testimony that at the time of the offense, defendant was not suffering from a severe mental disorder that affected his ability to conform his conduct to the requirements of the law and that defendant was able to understand and appreciate the criminality of his actions. The trial court, as the finder of fact in this case, was free to accept the opinion of one expert over another or to accept part and reject part of each expert's testimony. See *People v. McDonald*, 329 Ill. App. 3d 938, 946-47 (2002) (jury is free to accept the opinion of one expert witness over another or accept part and reject part of each expert's testimony); *People v. Cosme*, 247 Ill. App. 3d 420, 428 (1993) (trier of fact is free to accept or reject all or part of a witness's testimony). After acknowledging the conflicting testimony on the issue, the trial court chose to credit the testimony of the State's experts and therefore found that the State had proved beyond a reasonable doubt that defendant was not so intoxicated that he lost his capacity to either appreciate the criminality of his actions or to conform his conduct to the requirements of the law. We find that the evidence presented by the State was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was not involuntarily intoxicated at the time of the offense.

¶ 78    Defendant nevertheless claims that the trial court erred in crediting the testimony of the State's experts over those of his own and that the opinions of the State's experts were not credible because those experts: (1) refused to consider any evidence tending to show that defendant was not in control of his actions at the time of the offense; (2) relied almost entirely on defendant's self-reported symptoms; (3) relied on defendant's substance abuse to avoid considering whether he was bipolar; (4) gave "unbridled deference to [defendant's] own assurances to them that he was never manic or depressed" and that his actions were rational; (5) dismissed hospital records showing that defendant suffered from a panic attack in March of 2005 and the primary care physician's diagnosis of depression eight days after the murder; (6) improperly relied upon having seen no evidence that defendant had a mixed bipolar episode during his interrogation; and (7) did not consider how Wellbutrin affected defendant's mental state at the time of the offense. In addition to the above, defendant raises numerous other

challenges to the bases of the State's experts' opinions in support of his claim that that those opinions did not disprove defendant's affirmative defense that Wellbutrin prevented him from being able to conform his conduct to the requirements of the law.

¶ 79     Initially, defendant is incorrect when he asserts that the State's experts never considered how Wellbutrin affected defendant's mental state. Dr. Kulik testified that she considered that issue and concluded that there was no link between Wellbutrin and defendant's actions in murdering the victim. Dr. Kulik acknowledged that if Wellbutrin were given to a bipolar person, it would push that person into a manic state. However, the doctor did not believe that defendant suffered from a severe mental illness or defect and he did not see evidence that defendant was in a manic state. Dr. Kulik also opined that even if defendant was suffering from the symptoms he claimed, there was no link between those symptoms and the homicide. Therefore, Dr. Kulik concluded that despite defendant's use of Wellbutrin and claims as to how it affected him, defendant was able to appreciate the criminality of his actions at the time of the offense and did not have a severe mental illness or defect that could affect his ability to conform his conduct to the precepts of law.

¶ 80     Moreover, we find that all of defendant's claims amount to no more than an attack on the credibility of the witnesses and the weight to be given to their testimony and ultimately to a request that this court retry defendant. However, in considering a challenge to the sufficiency of the evidence, it is not the function of this court to reweigh the evidence or retry a defendant. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992); *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602 (2007). Rather, the trier of fact is responsible for assessing the witnesses' credibility, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). More specifically, "the credibility and weight to be given psychiatric testimony are matters for the trier of fact, who is not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State." *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007). "Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue." *In re Glenville*, 139 Ill. 2d 242, 251 (1990).

¶ 81     In this case, the record shows that all of the points defendant raises on appeal were raised at trial and rejected by the trial court. At trial, defendant explored all of the alleged inadequacies in the opinions of the State's experts through a vigorous cross-examination of those witnesses and through defendant's own testimony and the testimony of his expert witnesses. See *Lieberman*, 379 Ill. App. 3d at 602 (rejecting the respondent's attack on the credibility of the State's expert witnesses and noting that the "respondent explored all of the alleged inadequacies in [the State's experts'] opinions during a vigorous cross-examination of both witnesses and through the testimony of his own expert witnesses"); *In re Detention of Erbe*, 344 Ill. App. 3d 350, 372 (2003) (noting that traditional methods, such as cross-examination and rebuttal witnesses, offered the respondent the opportunity to challenge the State's experts' opinions in the proper forum–during trial in front of the jury).

¶ 82     In announcing its verdict in this case, the trial court took great effort to explain the reasons that it ultimately chose to credit the testimony of the State's experts over the testimony of defendant and his expert witnesses. The court explained in detail the reasons it found the State's experts more credible than defendant's experts and why it found defendant's testimony to be incredible. When denying defendant's posttrial motion, and specifically defendant's claim that the State failed to disprove his affirmative defense beyond a reasonable doubt, the

court again explained the reasons why it found the State's experts "more persuasive" and why it ultimately chose to credit their opinions that at the time of the offense defendant was able to appreciate the criminality of his actions and to conform his conduct to the requirements of the law. We find no basis in the record to substitute our judgment for that of the trier of fact on these matters and we decline defendant's request to engage in a point-by-point review of each part of each expert's testimony. As this court has explained:

> "[T]he mandate to consider all the evidence on review does not necessitate a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom. To engage in such an activity would effectively amount to a retrial on appeal, an improper task expressly inconsistent with past precedent." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007).

Considering the trial court's credibility findings as well as the evidence presented in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt.

¶ 83    Defendant next contends that he received ineffective assistance of counsel. Defendant claims that his attorneys were ineffective "in failing to request that [defendant] be re-evaluated for his fitness to stand trial after they stated their inability to communicate with [defendant] for six months was likely due to his mental illness and refusal to take medication." Defendant also claims that the trial court erred in failing to *sua sponte* order a second fitness evaluation. Defendant's argument is based on comments made by his attorneys at the hearing that took place on April 2, 2009, at which defendant's attorneys sought to withdraw from the case on the basis of their ongoing conflict with defendant.

¶ 84    Claims of ineffective assistance of counsel are resolved by the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id*. at 687. To demonstrate performance deficiency, defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). A "strong presumption" exists that the challenged action or inaction of counsel was a matter of sound trial strategy and a defendant can overcome that presumption only by showing that counsel's decision was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82. To demonstrate sufficient prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Put another way, defendant must show that "counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Defendant must satisfy both prongs of this test in order to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

¶ 85    Due process prohibits the prosecution of a defendant who is unfit to stand trial. *People v. Easley*, 192 Ill. 2d 307, 318 (2000). "A defendant is presumed to be fit to stand trial or to plead, and be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2006). A defendant is entitled to a fitness hearing only when a *bona fide* doubt of the defendant's fitness is raised. *Easley*, 192 Ill. 2d at 318; 725 ILCS 5/104-11(a) (West 2006).

¶ 86    "To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of *Strickland*, a defendant must show that facts existed at the time of trial that would have raised a *bona fide* doubt of his ability 'to understand the nature and purpose of the proceedings against him or to assist in his defense.' " *People v. Harris*, 206 Ill. 2d 293, 304 (2002) (quoting 725 ILCS 5/104-10 (West 1998)). To prevail on such a claim, defendant must demonstrate that the trial court would have found a *bona fide* doubt as to his fitness and that it would have ordered a fitness hearing. *People v. Johnson*, 183 Ill. 2d 176, 193 (1998). Defendant must further establish that after such a hearing, there is a reasonable probability that the trial court would have found him unfit to stand trial. *People v. Mitchell*, 189 Ill. 2d 312, 333-34 (2000).

¶ 87    A "*bona fide* doubt" has been characterized as a "real, substantial and legitimate doubt," and the test is an objective one. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). "[T]here are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Id*. (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Therefore, the question of whether a *bona fide* doubt of fitness exists is a fact-specific inquiry. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 123. "Because the trial court is in the best position to observe a defendant's conduct, whether a *bona fide* doubt of fitness to proceed exists is a matter that lies within the discretion of that court." *People v. Simpson*, 204 Ill. 2d 536, 550 (2001).

¶ 88    Relevant factors in assessing whether a *bona fide* doubt of fitness exists include "a defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on the defendant's competence to stand trial." *Easley*, 192 Ill. 2d at 319. The trial court's first-hand observations of a defendant's demeanor and behavior have also been considered. See *People v. Hanson*, 212 Ill. 2d 212, 223-24 (2004). The representations of defendant's counsel concerning the competence of his client, while not conclusive, are another important factor to consider. *Eddmonds*, 143 Ill. 2d at 518. However, "an assertion by counsel that a defendant is unfit does not, of itself, raise a *bona fide* doubt of competency." *Id*. at 519.

¶ 89    Fitness to stand trial and mental illness are not synonymous. *People v. Weeks*, 393 Ill. App. 3d 1004, 1009-10 (2009). "Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *Easley*, 192 Ill. 2d at 320 (citing *People v. Murphy*, 72 Ill. 2d 421, 432-33 (1978)). "[T]he existence of a mental disturbance or the need for psychiatric care does not necessitate a finding of *bona fide* doubt since '[a] defendant may be competent to participate at trial even though his mind is otherwise unsound.' " *Hanson*, 212 Ill. 2d at 224-25 (quoting *Eddmonds*, 143 Ill. 2d at 519). "The issue is not mental illness, but whether defendant could understand the proceedings against him and cooperate with counsel in his defense. If so, then, regardless of mental illness, defendant will be deemed fit to stand trial." *Easley*, 192 Ill. 2d at 323.

¶ 90    Finally, a defendant's unwillingness to cooperate with counsel does not of itself raise a *bona fide* doubt of defendant's fitness to stand trial. See *Easley*, 192 Ill. 2d at 320 (" 'Defendant's unwillingness to cooperate with counsel cannot be deemed equivalent with an inability to do so.' " (quoting *People v. O'Neal*, 62 Ill. App. 3d 146, 149 (1978))). Similarly, a defendant's disagreements with counsel do not necessarily raise a *bona fide* doubt as to fitness to stand trial. See *Simpson*, 204 Ill. 2d at 551 ("conflict about legal strategy does not rise to the level of mental incompetency on defendant's part").

- 21 -

¶ 91    Applying the relevant factors, we conclude that defendant has failed to show that facts existed at the time of trial that raised a *bona fide* doubt as to defendant's fitness to stand trial. The record shows that since he was released from the hospital following his arrest, defendant had not been on any psychotropic medication and had been in general population at the prison where he was being held. Then, on April 25, 2008, approximately eight months before trial, the trial court held a fitness hearing and found that defendant was fit to stand trial and legally sane at the time of the offense. At that hearing, neither the prosecution nor defense counsel questioned defendant's fitness to stand trial. Specifically, the prosecutor told the court that he did not believe a fitness hearing was necessary because not even the experts hired by the defense had found defendant unfit to stand trial. Defense counsel told the court that he had spent time with defendant and that he was "not questioning his fitness at all." The trial court nevertheless held the fitness hearing that day out of "an abundance of caution." At that hearing, the parties stipulated to the contents of the reports prepared by the court-appointed psychiatrist and psychologist who evaluated defendant. Those reports concluded that defendant understood the nature and purpose of the proceedings, that he was familiar with courtroom personnel and that he was capable of assisting in his own defense. The psychologist who evaluated defendant found that "[t]here is no clinical indication of a mental or physical condition that would preclude [defendant's] fitness to stand trial" and the psychiatrist found that defendant "shows the ability to cooperate with counsel in his defense if he so chooses." Based upon these expert opinions, the trial court found defendant fit to stand trial. See *People v. Smith*, 253 Ill. App. 3d 948, 954 (1993) (holding that the trial court did not abuse its discretion in finding no *bona fide* doubt as to the defendant's fitness and finding it "particularly compelling that defendant had been found fit to stand trial in an unrelated case just a few months before the proceeding in the present case"); *People v. Gibson*, 21 Ill. App. 3d 692, 695 (1974) (noting that when considering whether there is a *bona fide* doubt as to a defendant's fitness, "reliance has been placed upon the fact that a defendant was found competent following an evidentiary hearing shortly before a request for a second mental examination had been made").

¶ 92    Defendant nevertheless claims that defense counsel should have requested or the trial court should have *sua sponte* ordered another fitness hearing based upon comments from defendant's attorneys at the hearing on April 2, 2009. However, those comments do not indicate that there was a *bona fide* doubt as to defendant's fitness at that time and defendant's argument to the contrary is based upon a selective reading of defense counsel's statements. We initially note that in the months leading up to trial after the fitness hearing on April 25, 2008, during which defendant interacted with his attorneys and the court, there was never any indication from the defense or the court that there was a *bona fide* doubt as to defendant's fitness. Moreover, it is true that at the hearing on April 2, 2009, defendant's attorneys stated their opinion that defendant might have a "mental illness problem" and that he might be bipolar. Defense counsel also stated that "there's probably a real fitness issue here, too." However, even if it was true that defendant was bipolar or suffered from some other mental illness that required medication, which were issues that were disputed throughout the proceedings in this case, this would not necessarily raise a *bona fide* doubt as to defendant's fitness to stand trial. The issue is not whether defendant was mentally ill or required medication but, rather, whether defendant could understand the nature of the proceedings against him and cooperate with counsel in his defense. See *Easley*, 192 Ill. 2d at 322-23 (holding that evidence that the defendant had long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions did not raise a *bona fide*

- 22 -

doubt as to the defendant's fitness because the issue was whether defendant was fit to stand trial, not whether he suffered from a mental illness); *Hanson*, 212 Ill. 2d at 224-25 (the defendant's motion for a psychological evaluation asserting that he had been diagnosed with a brain disorder, dementia, seizure disorder and bipolar disorder and that these mental health problems " 'may affect his fitness' " did not raise a *bona fide* doubt as to fitness because "the existence of a mental disturbance or the need for psychiatric care does not necessitate a finding of *bona fide* doubt").

¶ 93        Defendant relies upon his counsel's statement at the hearing that "there's probably a real fitness issue here" as a basis for his claim that another fitness hearing should have been requested by counsel or ordered by the court. However, defendant ignores his counsel's ultimate opinion that defendant would be found fit if another fitness hearing was held. See *Eddmonds*, 143 Ill. 2d at 518 (counsel's representations regarding his client's competence are an important fact to consider when assessing whether a *bona fide* doubt as to defendant's fitness exists). Therefore, we cannot say that counsel's statement that there was a "fitness issue," when taken in context, indicates a *bona fide* doubt as to whether defendant was fit to stand trial.

¶ 94        Additionally, the reason that defendant's attorneys sought to withdraw from the case does not reflect that defendant was unable to communicate with counsel or assist in his own defense. When the entire record is considered, it is evident that defendant's attorneys sought to withdraw because defendant was unwilling to cooperate or communicate with them, not because he was unable to do so. The record further shows that defendant's refusal to cooperate was based on a long-standing disagreement with his attorneys regarding trial strategy. These disagreements with counsel over trial strategy and the resulting refusal to cooperate or communicate with counsel do not suggest a *bona fide* doubt as to fitness. See *Easley*, 192 Ill. 2d at 320; *Simpson*, 204 Ill. 2d at 551. To the contrary, the disputes that defendant had with his attorneys, and defendant's ability to communicate to his attorneys the position he wanted them to take, demonstrates that defendant in fact was able to assist in his own defense.

¶ 95        The trial court also had the opportunity to observe defendant's demeanor during several court dates leading up the April 2, 2009 hearing at which his attorneys sought to withdraw as well as at the hearing itself, where defendant personally addressed the court. In denying defendant's attorneys' motion to withdraw, the trial court found that defendant was simply engaging in "dilatory tactics" to avoid trial and that his disagreement with his attorneys was no more than a "strategic disagreement" that defendant would have with "the next lawyer or the lawyer after that." These comments reflect the court's opinion that defendant was unwilling, rather than unable, to cooperate with his attorneys. After denying the motion to withdraw, the court observed that "today and based on my observations on the last court dates, it is clear to me that [defendant] understands where he is, what he is doing, and that he is here in the courtroom and that he is understanding what I'm saying and is able to express himself to me here in court." These comments reflect that at the very hearing defendant claims the trial court should have *sua sponte* ordered a fitness hearing or counsel should have requested one, the court considered the issue and was of the opinion that no *bona fide* doubt as to defendant's fitness existed. We also note that the trial court had numerous subsequent opportunities to observe defendant during the remainder of trial and during posttrial matters and that the court never expressed any concern about defendant's fitness to stand trial. See *Hanson*, 212 Ill. 2d at 224 ("While a cold record may be an imperfect means of evaluating defendant's behavior and demeanor, we note that the trial court had the opportunity to observe defendant's conduct and

- 23 -

demeanor firsthand during the proceedings, yet expressed absolutely no concerns about defendant's ability to understand the nature of the proceedings or to work with counsel.").

¶ 96　　Although we too are looking at a cold record, our review of that record does not reveal a defendant who was unable to meaningfully participate in his defense or cooperate with counsel. To the contrary, the record shows that defendant actively participated in his own defense during all stages of the proceedings in the trial court. Defendant gave lengthy testimony at trial on his own behalf and was able to clearly express himself and communicate to the court. Defendant was also able to articulate his position and the strategy he wanted his attorneys to pursue at the April 2, 2009 hearing in which his attorneys sought to withdraw. In fact, when the court denied the motion to withdraw, defendant told the court that he understood the conflict with his attorneys involved only a "trial strategy conflict." Defendant's attorneys' comments to the court reflect that they were aware of the strategy defendant wanted them to pursue and the expert witnesses he wanted them to present, thus reflecting that defendant was *able to communicate* with his attorneys when he chose to do so. Defendant filed his own lengthy *pro se* posttrial motion in which he articulated the reasons he believed that Ambien caused him to commit the crime and the other evidence that he alleged had been ignored by the court. Defendant also articulated a clear statement in allocution during the mitigating portion of his sentencing hearing.

¶ 97　　For all of these reasons, we find that defendant has not shown that, at the time of trial, "there were facts in existence which raised a real, substantial and legitimate doubt as to his mental capacity to meaningfully participate in his defense and cooperate with counsel." *Eddmonds*, 143 Ill. 2d at 518. Accordingly, defendant has not shown that he was prejudiced when counsel did not request another fitness hearing. Because of our conclusion that there were no facts raising a *bona fide* doubt as to defendant's fitness at the hearing on April 2, 2009, we also conclude that the trial court did not abuse its discretion when it did not *sua sponte* order another fitness hearing at that time.

¶ 98　　Defendant next contends that the trial court denied him his right to effective assistance of counsel and a fair sentencing hearing by denying his attorneys' request for a continuance at the hearing that took place on June 11, 2009, the day the sentencing hearing was to be held. At the start of that hearing, defendant's attorneys sought to withdraw on the bases that they had a conflict with defendant, that another attorney, Michael O'Kane, was going to participate in posttrial matters and that a "mitigation packet" had been sent to the court without counsel's knowledge. One of defendant's attorneys explained that he had not spoken to defendant or his family in preparation for sentencing and that to proceed that day would put counsel in an "untenable position." O'Kane addressed the court during that hearing and stated that he was not prepared to handle sentencing that day or act as substitute counsel but that if the court were to grant a six-month continuance, O'Kane would later appear on defendant's behalf and obtain experts for the sentencing hearing. Defendant also addressed the court and said that he wanted O'Kane to represent him "in the future" and asked for a six-month continuance so that O'Kane could prepare "collateral information." The trial court denied defendant's attorneys' request to withdraw and defendant's request for a six-month continuance. The court stated that defendant was continuing to manipulate the system, as he had done throughout the course of trial, in order to avoid a sentencing hearing, that defendant did not have an absolute right to continue the case "indefinitely" when he did not have a new attorney ready to represent him that day and that the conflict alluded to by defendant's attorneys was the same disagreement over trial strategy that defendant had been having with his attorneys throughout trial. The court therefore denied

counsels' request to withdraw and defendant's request for a six-month continuance and stated "we are going to proceed with sentencing today." Defendant's attorneys then asked for a continuance "for the record," which the trial court denied.

¶ 99 It is this denial of his attorneys' request for a continuance "for the record" which claims was an abuse of discretion. Defendant essentially claims that because the court denied the request for a continuance, his attorneys were not prepared for the sentencing hearing and defendant was thereby prevented from adequately introducing mitigating evidence. We note that defendant does not claim that the court should have allowed his attorneys to withdraw or that the court should have granted defendant's request for a six-month continuance so that he could hire new counsel.

¶ 100 "All motions for continuance are addressed to the discretion of the trial court and shall be considered in the light of the diligence shown on the part of the movant." 725 ILCS 5/114-4(e) (West 2006). A trial court's refusal to grant a continuance will be reversed only when it is shown that the trial court abused its discretion and that the refusal prejudiced the defendant. *People v. Ward*, 154 Ill. 2d 272, 304 (1993). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009). We find no abuse of discretion in this case.

¶ 101 Numerous examples of defendant's refusal to cooperate with counsel and his efforts to delay the proceedings are found in the record. As the trial court observed, defendant's refusal to cooperate with counsel based upon a disagreement over trial strategy began even before trial. The record shows that this disagreement over the "Ambien defense" first surfaced before trial on April 2, 2009, when defendant's attorneys sought to withdraw based upon a disagreement with defendant over whether to pursue an "Ambien defense" and a breakdown in communication with defendant. The trial court had the opportunity to observe firsthand the events that were taking place and to observe defendant, who personally addressed the court during this hearing. After doing so, the court found that defendant was engaging in "dilatory tactics" to delay the case on the eve of trial. As the court observed, the case was already over two years old and numerous continuances had been granted to look into the issue of the "Ambien defense." The same judge presided over the rest of the proceedings in this case, including the day the case was set for a sentencing hearing when defendants' attorneys sought to withdraw and defendant asked for the six-month continuance. As the trial court observed that day, the case had been continued for sentencing for six months at that point and defendant waited until the day of sentencing to ask for a continuance to hire new counsel. However, defendant did not have a new attorney prepared to represent him that day or enter an appearance on his behalf. Defendant also involved a new attorney in the case without notifying his current attorneys and a packet of "mitigation material" was sent to the court without his attorneys' knowledge or permission. The trial court ultimately believed that defendant had ceased speaking with his attorneys prior to the sentencing hearing in order to manipulate the court and to delay the start of the sentencing hearing. We find that the trial court's determination that defendant was being dilatory and attempting to delay the proceedings was supported by the record and therefore was not arbitrary, fanciful or unreasonable.

¶ 102 We also find that defendant has not shown that he was prejudiced by the denial of the request for a continuance. In order to establish prejudice from trial counsel's ineffectiveness during sentencing, defendant must establish that but for trial counsel's failure to present certain mitigating evidence, defendant would have received a lighter sentence. See *People v. Griffin*,

178 Ill. 2d 65, 87-88 (1997). Under *Strickland*, proof of prejudice cannot be based on mere conjecture or speculation. *People v. Palmer*, 162 Ill. 2d 465, 481 (1994).

¶ 103     In this case, our review of the record and the trial court's comments establishes that the result of defendant's sentencing hearing would not have been different had a continuance been granted. When the trial court denied counsels' motion to withdraw on the day of sentencing, it observed that the packet of material that defendant's family had submitted was indeed all mitigating evidence. It contained material regarding his "Ambien defense" and numerous letters portraying defendant's background, family, education and employment history in a positive manner. The court stated that it had reviewed that material and that it had "never seen a stack of mitigat[ion] *** letters *** like this." After defendant's request to postpone sentencing was denied, the packet of mitigating material was entered into evidence.

¶ 104     At the sentencing hearing, defense counsel cross-examined the witnesses called by the State. In mitigation, defendant's attorneys called a former coworker and defendant's sister as witnesses. They testified that defendant was a caring, loving and trustworthy person who had never been violent. Defendant's sister testified that defendant was a caring and loving man who adored his family. Defendant addressed the court at length in allocution and expressed his remorse and sorrow to the court and the victim's family. Afterwards, defense counsel delivered a lengthy argument asking the court to impose a lenient sentence. Counsel pointed to substantial mitigating factors including defendant's mental illness, the tragic events that required defendant to testify against his former wife, his productive and law-abiding life and lack of criminal history and his contributions to society and his family. Counsel also argued that defendant was remorseful and that he had committed an irrational act brought on by his mental illness and that a low-range sentence was warranted.

¶ 105     In announcing sentence, the trial court stated that it believed defendant deserved a sentence near the maximum. However, the court acknowledged the numerous letters submitted on defendant's behalf as well as defense counsel's arguments regarding the statutory mitigating factors such as defendant's lack of a criminal history and that defendant was a "hard-working man" who was deeply involved with his family. Considering these mitigating factors, the court found that a sentence "right in the middle of the sentencing range" was appropriate.

¶ 106     Finally, in denying defendant's motion to reconsider his sentence, the trial court rejected any argument that a different sentencing strategy or additional mitigating evidence would have changed the sentence imposed. In his postsentencing motion, defendant argued that a different sentence might have been imposed had counsel introduced additional mitigating evidence. Before the hearing on the motion to reconsider sentence, the court invited defendant to call any additional witnesses if he wished to. Instead, defendant presented two affidavits from individuals who apparently were prepared testify at the original sentencing hearing attesting to defendant's good character.

¶ 107     At the conclusion of the hearing on the motion to reconsider sentence, where attorney O'Kane argued on defendant's behalf, the trial court rejected defendant's claim that his attorneys were ineffective during sentencing. The court observed that defendant's attorney "did the best they could. They cross-examined the witnesses that were present and they argued strongly and made a good case for their client." The court further stated:

> "The bottom line is that the information that I should have had, I got. I got it indirectly without the attorneys help because they were not allowed to help, but I got the information. I reviewed the information. Much of the information is the information that counsel argues I should have heard. I heard it. I heard it. I took it to

- 26 -

heart and I was on record stating that, for all intents and purposes, [defendant] did not have a criminal history, much less a significant criminal history before the fateful day where he murdered his boss and was caught red-handed doing so."

The court then reviewed counsels' performance at the sentencing hearing after the court denied their request to withdraw:

"[V]ery soon thereafter, their professionalism kicked in and they cross-examined witnesses, made all the points they should have made, presented what needed to be presented.

It was clear to me that the package of the 40 letters *** were filed by the family without the defense even knowing about it. But they got that information months before sentencing, were privy to it and I reviewed it. They did the best they could based on what [defendant] and his family presented them with.

There was no conflict despite the fact that they said there was a conflict. They were unhappy with the breakdown, but they represented him at the sentencing hearing, and under *Strickland*, they did the best they could and the best they could was more than enough, more than adequate, and he was sentenced to 40 years. *Nothing that I have heard would have changed the sentence, as I stated, based on everything that I heard and the arguments of counsel and [defendant's] statements.*

I found that before that date, he was a law-abiding citizen. There was much that he had contributed to society and there was much that he contributed to his family and I sentenced him right in the middle range between 20 and 60. *I still think that is the appropriate sentence, and nothing that I have heard, including the affidavits that were tendered today would have changed that sentence.*" (Emphases added.)

¶ 108     As the above makes clear, defendant was not deprived of a fair sentencing hearing or effective assistance of counsel during sentencing. Most importantly, the trial court's comments reveal that all of the information that defendant claims should have been brought to the court's attention was ultimately considered by the court, either before it imposed sentence or before it denied the motion to reconsider sentence. As the trial court found, none of the mitigating evidence that defendant claims should have been presented during the actual sentencing hearing, including his "Ambien defense" and the additional letters attesting to defendant's character, would have altered the sentence the trial court imposed. Therefore, defendant has not shown that he was prejudiced by the denial of the request for a continuance or by his attorneys' performance at the sentencing hearing.

¶ 109     Defendant's final contention is that the trial court abused its discretion in sentencing him to a term of 40 years' imprisonment given the "overwhelming" mitigating evidence presented and his potential for rehabilitation. Among other things, defendant points to the numerous letters written on his behalf attesting to his good character, to the fact that he suffers from a mental illness, to his lack of a criminal history and to his background, education and employment history.

¶ 110     The trial court is the proper forum for sentencing and its decision as to the appropriate sentence is entitled to great deference and weight. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). Where, as here, the sentence imposed by the trial court is within the statutory range for the offense of which defendant was convicted, we will not disturb that sentence absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). For the reasons that follow, we find none here.

¶ 111    Defendant first claims that the trial court did not adequately consider the mitigating evidence in sentencing him to a term of 40 years' imprisonment. We disagree.

¶ 112    When mitigating evidence is presented, it is presumed that the trial court considered such evidence, absent some indication to the contrary other than the sentence imposed. *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994). Here, defendant offers no evidence other than the sentence imposed to indicate that the trial court did not adequately consider the mitigating evidence. The record shows that the mitigating evidence was presented to the court and the court's comments clearly reflect that this evidence was given due consideration. The trial court stated that, in imposing a sentence near the middle of the permissible range, it considered defendant's lack of criminal history, the letters attesting to his character and his value to the community and to his family. On the other hand, the court also heard the evidence in aggravation and considered the nature of the offense and the court's opinion that defendant refused to take responsibility for his actions. A reviewing court will not reweigh the factors involved in the court's sentencing determination or substitute its judgment for that of the sentencing court merely because it would have weighed the factors differently. *Coleman*, 166 Ill. 2d at 261-62; *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

¶ 113    Defendant also claims that the court did not adequately consider his rehabilitative potential. Although defendant's potential for rehabilitation is a factor to be considered in imposing a sentence, the trial court is not required to give greater weight to this factor than to the seriousness of the crime. *People v. Boclair*, 225 Ill. App. 3d 331, 335-36 (1992). Here, our review shows that the trial court gave adequate consideration to defendant's rehabilitative potential. The court specifically stated that it considered this factor but that defendant's "ability to deflect responsibility" for his actions made him a dangerous person to the community. The court also noted that "in a fit of anger" defendant had killed a person who was "completely blameless" and that defendant "has excuses but no true remorse." Our review reveals that the court gave adequate consideration to the aggravating and mitigating factors and we therefore have no basis to alter the sentence imposed. *People v. Almo*, 108 Ill. 2d 54, 70 (1985).

¶ 114    For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

¶ 115    Affirmed.