2024 IL App (1st) 220970
No. 1-22-0970
Opinion filed March 29, 2024

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 8498 |
| | ) | |
| DESHAUN CARPENTER | ) | Honorable |
| | ) | Michael Joseph Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor dissented, with opinion.

**OPINION**

¶ 1    Deshaun Carpenter was driving an "older model" Dodge Nitro with one broken taillight and a small object suspended from the rearview mirror when three officers curbed the car, ordered Carpenter out, and asked whether "narcotics" or "weapons" were in the vehicle. An officer admitted on cross-examination that a single broken taillight was not a lawful basis for a stop. And in the body-camera footage, officers never mention the obstruction hanging from the rearview mirror. But they tore apart the car and found a loaded firearm embedded within the driver seat.

¶ 2     Carpenter was charged with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C)). Carpenter moved to suppress the loaded handgun as the fruit of an illegal search. But his counsel withdrew the motion after conferring with Carpenter. Following a bench trial, the court convicted Carpenter of constructive possession of the handgun. On appeal, Carpenter asserts (i) the State did not prove beyond a reasonable doubt that he knew about the handgun and (ii) ineffective assistance of counsel in withdrawing the motion to suppress.

¶ 3     Viewing the evidence in the light most favorable to the State, as we must, neither the facts nor inferences support the trial court's findings of guilt. We reverse.

¶ 4                         Driving While Black: A Matter of Public Safety

                                  and Racial Justice

¶ 5     Appellate courts deal with the issues and the record before them. On rare occasions, however, a far-reaching but unexamined and unbriefed concern emerges so affecting the integrity and perception of fairness that we invoke our discretion to raise it on our own, in Latin, *sua sponte*. See *Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.") Here, fundamental justice calls for us to raise a concern vital to public safety although it has no role in our resolution on the merits.

¶ 6     What is known as "driving while Black" (DWB) is a pernicious reality that corrodes trust in law enforcement and the legal system. DWB involves police using "stereotypical thinking and

hunches" and "dubious investigative techniques" in traffic stops. *Commonwealth v. Feyenord*, 833 N.E.2d 590, 604 (Mass. 2005) (Greany, J., concurring). Numerous studies have extensively documented the unsettling reality of DWB. See Emma Pierson *et al.*, *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736 (2020), https://5harad.com/papers/100M-stops.pdf [https://perma.cc/2Y9S-VLFA] (analyzing nearly 100 million stops across nation between 2011 and 2018 and finding Black drivers were less likely to be stopped after sunset when "veil of darkness" masked race); Ill. Dep't of Transp., Illinois Traffic and Pedestrian Stop Study 2022 Annual Report: Pedestrian Stop Analysis 18-19 (2023), https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/final--part-i-executive-summary-pedestrian-6-30-23.pdf [https://perma.cc/ZUE8-2TFR] (racial profiling possible factor in traffic stops); see also Pascal Sabino, *Cops Rarely Pull Over Drivers In Their Own Neighborhoods, Data Shows. Motorists In Black Neighborhoods Aren't So Lucky*, Block Club Chi. (Oct. 27, 2021), https://blockclubchicago.org [https://perma.cc/PHC2-JEMD] (mapping all 327,224 traffic stops by Chicago police in 2020 and finding "tremendous bulk of drivers" stopped in neighborhoods on the South and West sides and "few drivers" stopped in mostly white neighborhoods on North Side).

¶ 7    The General Assembly has responded, precluding stops on the then-lawful basis offered by the officer in this case. See Pub. Act 103-32, § 5 (eff. Jan. 1, 2024) (adding 625 ILCS 5/12-503(c-5)) (directing, "[n]o motor vehicle, or driver or passenger of such vehicle, shall be stopped or searched by any law enforcement officer solely on the basis of a violation or suspected violation of [the material obstruction] subsection").

¶ 8    Much of the evidence presented to the trial court consisted of body-camera footage that two of the arresting officers recorded. Although DWB does not enter our legal analysis and

decision, the record compels our posing a question—would this stop have proceeded as it did had Carpenter been white?

¶ 9     Asking the question stimulates dialogue on racial justice and public safety. See generally Press Release, Ill. Supreme Court, Supreme Court Releases Statement on Racial Justice, Next Steps for Judicial Branch (June 22, 2020), https://www.illinoiscourts.gov [https://perma.cc/E66J-2ZYX]. It also reinforces the judiciary's commitment to upholding the principles of justice and reinforcing public trust in the legal system. See, *e.g.*, *State v. Clinton-Aimable*, 2020 VT 30, ¶ 37, 212 Vt. 107, 232 A.3d 1092 (Reiber, C.J., concurring) ("Although not specifically presented or addressed, an underlying question in this appeal is the extent to which defendant's race played a role in the decisions by police to stop and search him and his car."); *United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (observing, under fourth amendment, race is "not irrelevant" though not "decisive" either); *United States v. Smith*, 794 F.3d 681, 688 (7th Cir. 2015) (same).

¶ 10     Addressing the specter of DWB is crucial to the dismantling of this systemic injustice. Several essential indicators of DWB are laid bare by the evidence, including (i) minor infractions as a pretext for investigating unrelated suspicions; (ii) stereotypes or assumptions about race based on police conduct or statements during the stop; (iii) prolonged detention inconsistent with the nature of the stop; (iv) a search without proper justification, usually based on stereotypes rather than reasonable suspicion, (v) unequal enforcement, such as pulling over a person of color, for a violation seldom of consequence in a white neighborhood; (vi) targeting neighborhoods or areas predominately populated by people of color; and (vii) use of disrespectful behavior, aggression, or excessive force by police. Individually or together, the elements do not indicate or imply racial bias, and most police officers strive to act properly and respectfully. Nevertheless, the more indicators, the more likely the stop was for DWB.

¶ 11    Judges ensure that the law is fairly and consistently applied to all. The dissent's critique that "this issue [(DWB)] was never raised by Carpenter" repudiates the long-standing appellate court commitment to upholding the rule of law by exercising its authority. *Infra* ¶ 50. Relatedly, despite our discussing DWB generally and not on the merits, the dissent curiously treats our observations as an adjudication. *Infra* ¶ 50 (citing *Singleton v. Wulff,* 428 U.S. 106 (1976), which reproached appellate court for reaching merits of issue not presented by parties). In our view, abstaining from saying anything about DWB, which our dissenting colleague urges us to do, condones the officer's actions here and continues to normalize a practice that exposure, not silence, will eliminate.

¶ 12                                  BACKGROUND

¶ 13    Police officers in the South Chicago neighborhood curbed an "older model" Dodge Nitro with one broken taillight and a small object, the shape of an air freshener, suspended from its rearview mirror. They ordered the driver to stand facing the rear window with his hands on the back of the car. No one else was in the car.

¶ 14    Deshaun Carpenter identified himself as the driver. He told the officers that he borrowed the car, which belonged to his girlfriend's friend. Lieutenant Piechocki, standing directly behind Carpenter, asked, "You got nothing in that car or anything on you that I need to know about? No narcotics? No weapons?" Carpenter denied possessing narcotics or weapons. Officers began to search the car for drugs or firearms. Thirteen minutes later, the officers found a loaded handgun deeply embedded between the metal frame and cushioning of the driver seat. Carpenter was charged with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C)).

¶ 15    Carpenter moved to suppress the loaded handgun as the fruit of an illegal search. But counsel withdrew the motion after conferring with Carpenter. They elected to have a bench trial.

¶ 16                                    Bench Trial

¶ 17    The State's case included (i) testimony from Piechocki, who found the loaded handgun, and (ii) body cam footage recorded from Piechocki's and Officer Pizzo's perspectives.

¶ 18    Piechocki testified that he and two others curbed a car on a spring afternoon and ordered the driver to step out. Piechocki directed Carpenter to stand facing the rear window as Pizzo and Officer Brienzo searched the car. Piechocki stood behind Carpenter and noticed three moments when Carpenter pushed his face toward the tinted rear window, appearing to watch the officers as they searched. Seeing this, Piechocki handcuffed Carpenter and sat him in the back of a second squad car that had arrived.

¶ 19    Body cam footage played for the court depicts Carpenter obeying the command to get out of the car and, on his own, placing his hands on the roof. Piechocki then orders Carpenter to move to the back of the car, put his hands on the roof, and face the rear window. Pizzo asks Carpenter the last name of the person who owned the car; Carpenter replies he does not know their last name, but the car's owner is his girlfriend's friend. Piechocki stands behind Carpenter with his fingers inside Carpenter's waistband and pats him down. Twenty seconds pass as Carpenter leans away from the rear window to answer Piechocki's questions and again toward the window, three times in all, after which Piechocki puts Carpenter in handcuffs and takes him to sit in a squad car.

¶ 20    On the video, Piechocki explains why he detained Carpenter to Pizzo and Brienzo. First, he approaches Brienzo in a squad car and says, in part, that Carpenter "kept looking" at Pizzo as he searched. Piechocki goes over to Pizzo, who is in the driver's seat searching the car, and says, "As soon as you opened the door, he kept looking through the back window. And so, I thought,

'Maybe he got overly concerned with what was going on here.' " Within two minutes of ordering Carpenter out of the car, Piechocki cuffed him, asserting: "Do me a favor: Put your hands behind your back right now. *** Figure out if you got a valid license or not." He then detains Carpenter in the back of a squad car that had arrived.

¶ 21  On the stand, Piechocki narrated these parts of the video. He testified, "[Carpenter's] leaning up against the car and appears nervous to me." When asked why he handcuffed Carpenter, Piechocki said, "No proof of driver's license[,] *** [and Carpenter] wasn't able to [say] who the owner of the vehicle was so I was thinking the vehicle may be stolen." No evidence was produced regarding a stolen vehicle.

¶ 22  Piechocki testified that Pizzo and Brienzo sat in the driver's seat while searching. According to Piechocki, Pizzo and Brienzo never said anything to him about feeling a rigid object under the driver's seat.

¶ 23  Thirteen minutes into the search, Piechocki jabbed at the center of the driver's seat and felt a hard object. When Piechocki pulled back the lining of the front seat near the floor, he found a loaded "small handgun." The gun had been embedded between the seat's steel frame and

cushioning. Pizzo's body cam footage captured the handgun within the driver's seat.



¶ 24    At the close of the case-in-chief, the State introduced a certified copy of Carpenter's prior conviction for aggravated unlawful use of a weapon. The parties stipulated that Carpenter possessed neither a firearm owner identification nor a concealed carry license at the time of arrest.

¶ 25    Carpenter moved for a directed verdict. Counsel had argued in the opening statement, "[A]lthough [Carpenter] was sole occupant had control of the car, the [c]ourt is not going to hear anything that indicates that [ ] Carpenter knew this gun was between the metal seat structure and underneath all of the foam padding and upholstery[.]" The State, counsel had argued, would present no evidence about how long Carpenter had been in the car before the stop. And the trial court would hear the car was not registered to Carpenter. The trial court denied a directed verdict.

¶ 26    The trial court found Carpenter guilty of all counts, concluding he had constructively possessed the loaded handgun.

"Constructive possession exists where the defendant had knowledge of the presence of the contraband and immediate and exclusive control over the area where the contraband would be found. The knowledge can be inferred from the circumstances. Under these circumstances, the Court finds that the Defendant knew the gun was under the seat. There's no evidence as to how he got the gun, got the car. There is no evidence as to how long he had it.

He couldn't explain to the police officers who actually owned the car. That, to me, sounds like circumstantial evidence that he's in control of that car. Control over the area where the contraband was found in this case supports the finding that the Defendant possessed the contraband."

¶ 27 The trial court denied Carpenter's motion for a new trial, again believing Carpenter had constructively possessed the handgun.

"[Y]ou're the only guy in the car. There is nobody else in the car with you. It's right within your control. You're driving the car, and you have no idea who owns the car, which I find hard to believe, so *** the State has proven the case beyond a reasonable doubt. There are other factors that could have been entered into this. They didn't. Okay. So, for that reason, the motion is denied."

¶ 28 The trial court sentenced Carpenter to seven years' imprisonment with one year of mandatory supervised release for unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)).

¶ 29                                    ANALYSIS

¶ 30 Carpenter contends that (i) counsel provided ineffective assistance by advising him to withdraw a meritorious motion to suppress and (ii) the State failed to prove beyond a reasonable

doubt that he knew a loaded handgun was in the car. Because we agree the State failed to prove Carpenter's knowledge of the loaded handgun, we decide that claim only.

¶ 31    Assessing the sufficiency of the State's proof requires us to look at the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The pertinent element, the parties agree, is possession. See 720 ILCS 5/24-1.1(a) (West 2018) (defining possession as element of unlawful use or possession of weapons by felons).

¶ 32    Possession falls into two categories: actual and constructive. See *People v. Wise*, 2021 IL 125392, ¶ 24 (noting pertinent statute prohibits possession "on" and "about" a person). The officers did not find the loaded handgun in Carpenter's hands, for example, so Carpenter did not have actual possession. *E.g.*, *People v. Gonzalez*, 151 Ill. 2d 79, 85 (1992) (noting State proved actual possession by presenting officer testimony about seeing defendant toss firearm).

¶ 33                                    Constructive Possession

¶ 34    The State proves constructive possession by establishing the defendant (i) knew the handgun was present and (ii) had immediate and exclusive control over the area. *Wise*, 2021 IL 125392, ¶ 25. Control is not in dispute, nor could it be. Carpenter was driving the car and had control over the area where the gun was found. The parties dispute only the first prong—whether Carpenter knew that a handgun was embedded within the driver's seat.

¶ 35    Carpenter contends the State presented no evidence from which a rational trier of fact could have inferred that he knew of the handgun. He points out that in the body cam footage, he disclaims (i) possession of a firearm and (ii) ownership of the car. No physical evidence, like fingerprints, connected him to the handgun or the chambered round. None of his possessions were in the car.

No witness testified about when he got into the car, just that he had been stopped on suspicion of committing minor traffic violations.

¶ 36    The trial court's findings of fact support Carpenter's contentions. That is to say, while the trial court concluded that Carpenter had knowledge of the handgun, its underlying findings supported the opposite conclusion. The trial court noted the absence of evidence that Carpenter owned the car or had ever used it before, asserting: "There's no evidence as to how he got the gun, got the car. There is no evidence as to how long he had it." This is evidence that Carpenter lacked knowledge about the car and, thus, the handgun.

¶ 37    Carpenter's contentions also find support in our caselaw. Proof of ownership serves as critical evidence of knowledge. See *People v. Clodfelder*, 172 Ill. App. 3d 1030, 1032, 1034 (1988) (holding proof of constructive possession sufficient where "[d]efendant admitted ownership of the vehicle and the rifle and knowledge of where the rifle had been placed in the vehicle"). Generally, "knowledge cannot be inferred merely because a defendant had control over the area in which the evidence was discovered at the time of its discovery." *People v. Hampton*, 358 Ill. App. 3d 1029, 1032 (2005).

¶ 38    While an old case, the legal principle in *People v. Liss*, 406 Ill. 419 (1950), remains a lodestar for our supreme court. See *Wise*, 2021 IL 125392, ¶¶ 32-33 (discussing *Liss*). In *Liss*, an officer stopped the defendant for a traffic violation. The officer searched the car and the defendant and his companion, who occupied the front passenger seat. *Liss*, 406 Ill. at 420-21. The officer found a pistol "beneath the front seat of the car, at about the middle thereof, six inches back under the seat." *Id.* The defendant testified that he borrowed the car, had never seen the handgun, and did not own it. *Id.* at 421. The passenger also testified that he did not own the gun, did not put it under the seat, and had not seen anyone else put it there. *Id.* The State offered "[n]o testimony"

about "the ownership of the automobile, or in rebuttal of the testimony of the defendant and his companion." *Id.* at 421. The supreme court reversed the defendant's conviction: "[W]hen the statute prohibits the concealing of a weapon 'on or about the person' *** the weapon must be actually concealed on the person, or in such close proximity that it can be readily used as though on the person." *Id.* at 422.

¶ 39 Here, as in *Liss*, the State offered no evidence that Carpenter owned the car or that the gun embedded within the car's seat was "in such close proximity" that Carpenter could have readily used it. On the contrary, the State presented evidence that trained officers who seemed intent on finding something spent over 13 minutes meticulously inspecting every corner of the front cabin, even pulling back all the foam to dislodge it. So, under *Liss*, Carpenter's presence in the car did not prove constructive possession. See *id.* Contrary to the dissent's characterization, we do not assert that the State needed to prove ownership or proximity. *Infra* ¶ 58. Rather, we apply long-standing Illinois law and conclude the State presented no evidence from which a rational trier of fact could reasonably infer that Carpenter knew the gun was present. See *Hampton*, 358 Ill. App. 3d at 1032 (finding no evidence permitted inference of knowledge where State offered "no proof that defendant had any regular, ongoing control over the vehicle in which the weapon was found or that defendant had ever driven the vehicle prior to the time of the traffic stop").

¶ 40 In reaching this conclusion, we reject the State's contention that "ample grounds" permitted the trier of fact to infer that Carpenter knew about the embedded handgun. The State speaks of Carpenter's "nervous conduct in three times looking through the rear window as the officers searched the front seat[ ] and the fact that the seat [Carpenter] was sitting on contained an abnormal rip and a hard object which was later revealed to be a firearm." But we review all the evidence, not some. *Collins*, 106 Ill. 2d at 261. Common sense informs us that anyone stopped by three

- 12 -

officers might appear nervous to an officer. Moreover, who would not look through the rear window to see what the officers were doing?

¶ 41    Indeed, the officers had ordered Carpenter to stand facing the rear window while they searched the car and him. Contrary to the dissent's incorrect claim, we do not assert the officers ordered Carpenter to look through the window—the officers ordered Carpenter to face the rear window. *Infra* ¶ 56. Thus, Carpenter's looking complied with the officer's orders. To equate cooperation with consciousness of guilt assumes wrongdoing regardless of what happened. Moreover, compliance meant nothing to Piechocki, who had fixed in his mind the conclusion the dissent reaches: Carpenter must know a handgun is in the car, which is a preconceived notion and not a reason, a pernicious presumption and not a rational inference.

¶ 42    And, as Carpenter notes, even if the trial court believed Piechocki's after-the-fact impression of Carpenter as "nervous," nervousness is not enough to uphold a finding of knowledge. *People v. Ortiz*, 196 Ill. 2d 236, 266-67 (2001) ("although nervousness does weigh in favor of a finding of knowledge, it is not in and of itself sufficient to uphold such a finding"); see *People v. Evans*, 2024 IL App (1st) 220384-U, ¶¶ 78-82 (Ocasio, J., dissenting) (discussing phenomenon of "driving while Black or Brown").

¶ 43    Further, finding contraband does not, without more, establish reasonable suspicion or probable cause to stop or search. See *People v. Colyar*, 2013 IL 111835, ¶ 39 (noting specific and articulable facts must support officer's decision to conduct protective search of car compartment for hidden weapon); see generally *People v. Hackett*, 2012 IL 111781, ¶¶ 19-20 (explaining differences in analyzing traffic stops for probable cause and reasonable suspicion).

¶ 44    Besides, Carpenter did and said nothing during the encounter that would cause the officers to conjecture that he knew about the handgun. The dissent relies on Piechocki's conclusory

testimony that Carpenter appeared "overly concerned" (*infra* ¶ 55) but overlooks the body-camera footage, shot from Piechocki's perspective, which proves his testimony lacked any basis. Adverbs are no substitutes for record facts. And contrary to the dissent's dismissive assertions, seeing this takes no special insight into "human nature." *Infra* ¶ 56. We pressed play on the State's exhibit after reading Piechocki's conclusory testimony. The footage shows Carpenter complied with the officers' commands, responded politely, and remained respectful throughout the ordeal.

¶ 45    And Carpenter did so despite reasonable grounds he might have had for distress from inherent anxiety due to a police stop to fear of authority, none of which indicate wrongdoing. An officer's show of authority when curbing a vehicle makes drivers and passengers nervous, no matter their race. And, "[p]olice may consider innocent actions, such as a suspect's nervous and evasive behavior, in assessing whether there is reasonable suspicion or probable cause, but this practice disproportionately impacts people of color." *Clinton-Aimable*, 2020 VT 30, ¶ 37 (Reiber, C.J., concurring). "[R]ecent tragic events have shown that the fear people of color have of being stopped by police is justified: African-Americans have been killed during routine traffic stops." *Commonwealth v. Buckley*, 90 N.E.3d 767, 781 & n.3 (Mass. 2018) (Budd, J., concurring) (noting national attention on officers shooting to death, during routine stops, Philando Castille, Samuel DuBose, and Walter Scott).

¶ 46    Finally, although the State describes a driver's seat with a slight rip as "abnormal," nothing in the record supports that assessment. On the contrary, Piechocki agreed that the car appeared to be "an older model," and Pizzo and Brienzo sat on the rip and never noticed it. As for Carpenter sitting on a "hard object," two trained officers did too and never reported feeling a "hard object." Nor does the record support that, unlike Pizzo and Brienzo, Carpenter would more likely feel the presence of a hard object. *Cf.* Hans Christian Andersen, *The Princess on the Pea*, *in* Fairy Tales

and Stories 24, 24-25 (Signe Toksvig ed., 1921), available at www.loc.gov/item/21020570/ [https://perma.cc/VBG5-5VPV] (tale of girl who proved herself to be "a *real* princess" by feeling a pea through 20 mattresses). That evidence relates to an inference about Carpenter's knowledge. But, as two trained officers did not feel the presence of the handgun under the seat, nothing in the record supports a reasonable inference that Carpenter would have sensed it. The dissent's contrary conclusion rests on neither fact nor inference but speculation.

¶ 47    The record contains nothing from which a rational trier of fact could infer that Carpenter knew the handgun was embedded within the structure of the seat of a car he was never proven to have owned or operated. So, we must reverse on that ground alone.

¶ 48    Reversed.

¶ 49    JUSTICE TAILOR, dissenting:

¶ 50    I would affirm because the evidence was sufficient to sustain Carpenter's conviction for unlawful possession of a weapon by a felon. And while I share the majority's concern about racial profiling in policing, I cannot support the majority's "*sua sponte*" conclusion that the "essential indicators of DWB [driving while Black] are laid bare by the evidence" here. *Supra* ¶ 10. Although the majority contends that I am "urg[ing]" them to "abstain[ ] from saying anything about DWB" and "condon[ing] the officer's actions here" (*supra* ¶ 11), I merely find that this is not the appropriate case to analyze it, because this issue was never raised by Carpenter, either before the trial court or on appeal. Thus, the State had no opportunity to argue that Carpenter's stop passed constitutional muster under *Whren v. United States*, 517 U.S. 806, 813 (1996) (recognizing that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis") or otherwise offer evidence that police did not racially profile Carpenter when they pulled him over. See *Singleton v. Wulff,* 428 U.S. 106, 119-21 (1976) (finding the appellate court's decision to reach

the merits of an issue not presented by the parties below to be an "unacceptable exercise of its appellate jurisdiction[,]" because petitioner "had no opportunity to proffer [any] evidence" or to "present whatever legal arguments he may have in defense of the statute" and concluding that "injustice was more likely to be caused than avoided by deciding the issue without petitioner's having had an opportunity to be heard").

¶ 51    While Carpenter filed a motion to suppress the handgun that was recovered from the vehicle he was driving as the fruit of an illegal search, this motion never alleged that police stopped him on account of his race. Because Carpenter chose to withdraw this motion to suppress and instead proceed to trial, where he challenged only the sufficiency of the evidence, the trial court heard no evidence regarding the legality of the stop based on the "obstruction of [Carpenter's] view" caused by an air freshener hanging from his rear view mirror, and the State had no opportunity to present evidence to rebut any contention that police pulled Carpenter over on account of his race or otherwise argue that the stop was not unconstitutional. If Carpenter's conviction were to be affirmed on appeal, as I submit it should be, he still could potentially raise an ineffective assistance claim in a postconviction proceeding based on trial counsel's failure to advance a claim that he was racially profiled by police when they curbed him, where a factual record would be developed with the State being given a fair opportunity to respond. See *People v. Bew*, 228 Ill. 2d 122, 134-35 (2008) (finding the record insufficient to address defendant's ineffective assistance of counsel argument but noting that defendant could raise this issue in a postconviction proceeding, which would "allow[ ] both defendant and the State an opportunity to develop a factual record bearing precisely on the issue" (internal quotation marks omitted)).

¶ 52    Moreover, our court has addressed claims by defendants that they were racially profiled when they were pulled over by police. See, *e.g., People v. Sims*, 2022 IL App (2d) 200391, ¶¶ 96,

99 (defendant argued at trial that the police officer "engaged in racial profiling tactics and that race influenced his policing practices" and challenged the trial court's decision to deny discovery to support his selective enforcement claim on appeal); *People v. Hill*, 2022 IL App (5th) 190505-U, ¶ 26 (defendant argued on appeal that police officer engaged in racial profiling when conducting the traffic stop); *People v. Fields*, 2024 IL App (4th) 210194-B, ¶ 42 ("While the stop does seem unusual, and we are mindful of the perverseness of racial profiling, no evidence was submitted to the trial court which suggested Deputy Campbell pulled defendant over because she was black."). I would also point out that a class action lawsuit is currently pending in the United States District Court for the Northern District of Illinois alleging that the Chicago Police Department has a policy and practice of stopping motorists based on their race in violation of the federal constitution. See Wilkins v. City of Chicago, No. 23-CV-4072 (N.D. Ill.) (class action lawsuit filed June 26, 2023, seeking to enjoin the Chicago Police Department's practice of racially discriminatory mass traffic stops).

¶ 53    " '[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.' " *People v. Givens*, 237 Ill. 2d 311, 324 (2010) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)) (reversing the appellate court based on its *sua sponte* determination that a tenant did not have authority to consent to a search by police of a bedroom in the tenant's apartment occupied by overnight guests). See also *Hormel v. Helvering*, 312 U.S. at 556 (stating that "[o]rdinarily an appellate court does not give consideration to issues not raised below[,] which is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues *** [and so] that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence"). Claims of racial

profiling by police in traffic stops should be addressed by the courts in cases where they are raised and not through *sua sponte* discourse in cases where they are not.

¶ 54    Addressing the issues Carpenter raises on appeal, I do not agree with the majority's conclusion that neither the facts nor inferences support the trial court's findings that Carpenter was guilty of unlawful possession of a weapon by a felon. Viewing the evidence "in the light most favorable to the prosecution" (*People v. Smith*, 185 Ill. 2d 532, 541 (1999)), and allowing all reasonable inferences in its favor (*People v. Starks*, 2019 IL App (2d) 160871, ¶ 36), the fact finder could have reasonably concluded that Carpenter constructively possessed the handgun that was recovered from the sport utility vehicle he was driving. The issue of control was not in dispute; the evidence showed that Carpenter had control over the vehicle in which the gun was found. Although Carpenter did not own the vehicle, he was in possession of the keys and was its sole occupant when he was stopped by police. See *People v. Chavez*, 327 Ill. App. 3d 18, 26 (2001) ("it is control of the vehicle rather than ownership *** which is pertinent to proof of control of the area in which [contraband is] found"); see also *People v. Janis*, 56 Ill. App. 3d 160, 163 (1977) (the fact that the defendant was sitting in the driver's seat gave police reason to approach the vehicle, and defendant's claim that he borrowed the vehicle from someone else supported a finding of constructive possession).

¶ 55    While Carpenter's presence in the vehicle, standing alone, was insufficient to support a finding that he knew there was a handgun underneath the driver's seat, additional evidence supported a finding of knowledge. First, the gun was found between the frame and cushion of the driver's seat, where Carpenter had been sitting. See *People v. Wise*, 2021 IL 125392, ¶ 29 ("The defendant's proximity to the weapon is another factor that courts have found relevant in determining whether the defendant constructively possessed a firearm."). Second, the fact finder

could have reasonably inferred that Carpenter knew there was a gun underneath the driver's seat because he repositioned his body multiple times to obtain a vantage point from which to see what the officers were doing once they began to search the vehicle. See *People v. Ross*, 407 Ill. App. 3d 931, 936 (2011) ("Knowledge may be proven by evidence of a defendant's acts, declarations or conduct from which it can be inferred he knew the contraband existed in the place where it was found."). As the video from Piechocki's body worn camera shows, officers told Carpenter to get out of the vehicle and stand facing the rear of the sport utility vehicle with his hands on the roof. However, as soon as officers began searching the driver's side area of the vehicle, Carpenter almost immediately cupped his hands on the tinted rear window and leaned his head and body into his hands to look through the window of the vehicle. He continued looking through the rear window for approximately 10 seconds. Carpenter then returned to an upright position. A couple seconds later, he leaned his head and body into his cupped hands to look through the window a second time. A few seconds later, he returned to an upright position. A few seconds after that, he leaned his head and body into the window a third time to look through the rear window as officers continued their search. As he returned to an upright position once again, he shifted his body slightly to the left, which gave him a vantage point to the driver's side of the vehicle where the officer was searching. Piechocki is overheard on the video stating that he observed Carpenter's movements, including the fact that he "kept looking through the back window," which led him to believe that Carpenter was "overly concerned with what was going on in here." At trial, Piechocki testified that Carpenter "appear[ed] to be nervous" during the search. While nervousness, standing alone, is insufficient to uphold a finding of knowledge, it "does weigh in favor of a finding of knowledge." *People v. Ortiz*, 196 Ill. 2d 236, 266-67 (2001); *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 15. A reasonable fact finder could infer from the video and Piechocki's

testimony that Carpenter was looking into the rear window of the sport utility vehicle and at the driver's side door because he was concerned that the officers would find the handgun that was hidden between the frame and cushion of the driver's seat. When viewed in the light most favorable to the prosecution, this evidence supports a finding of knowledge.

¶ 56    The majority contends that Carpenter was merely "compl[ying] with the officer's orders" by "looking" through the rear view window. But no officer told Carpenter to look through the rear window, and I see no reason why an officer would. Rather, as directed by the officers, Carpenter placed his hands on the back of his vehicle with his arms outstretched, where he stood responding to the officer's questions. Carpenter looked through the window only after officers started searching the driver's seat. The majority alternatively dismisses this evidence as insignificant, stating, "who would not look through the rear window to see what the officers were doing?" *Supra* ¶ 40. I see no reason why the majority's insight into human nature is better than the fact finder's in this case. But even accepting the majority's conclusion that anyone in Carpenter's situation would look through the rear window as officers searched the vehicle, the fact finder still could have reasonably inferred that Carpenter's movements were not innocuous and that Carpenter was concerned that officers would find the gun that was secreted between the frame and cushion of the driver's seat where he looked through the rear window three times in quick succession and then looked at the driver's side of the vehicle where the officer was searching. That determination was the prerogative of the fact finder, and there is no good reason to disturb it.

¶ 57    The majority incorrectly characterizes the entirety of evidence supporting the trial court's finding of knowledge as nothing more than "Carpenter looking into the rear window" of the vehicle he was driving. However, Piechocki's testimony supported the fact finder's decision as well. Piechocki testified that after noticing that the side and top of the driver's seat was torn, he pushed

down on the seat and felt a "hard object" where the tear was. He then pulled up the seat and observed a handgun beneath it. The majority summarily dismisses Piechocki's testimony because two other officers did not feel a hard object underneath the seat. However, it is not our role to "reweigh the evidence or retry a defendant" but to "resolve[ ] all reasonable inferences in favor of the State." *People v. Tuduj*, 2014 IL App (1st) 092536, ¶¶ 72, 80; *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 47 ("[I]t was the responsibility of the [fact finder], not this court, to determine the credibility of witnesses, weigh the evidence, and resolve any inconsistencies."). If we view Piechocki's testimony in the light most favorable to the prosecution, it supports an inference that Carpenter also felt a hard object underneath the seat and was aware of the presence of the handgun. See *Ross*, 407 Ill. App. 3d at 935 ("A trier of fact is entitled to rely on reasonable inferences of knowledge and possession.").

¶ 58    The majority cites *People v. Liss*, 406 Ill. 419 (1950), but there the defendant was convicted of carrying a concealed weapon on or about his person, a crime which requires "[c]oncealment and accessibility a[s] [its] essential elements." *People v. McClendon*, 23 Ill. App. 2d 10, 11 (1959) (citing *Liss*, 406 Ill. 419). The *Liss* court reversed the defendant's conviction in large part because the statute required the weapon to be "so placed that it may be used without appreciable change in the position of the owner" and the evidence "fail[ed] to show that the pistol lying under the seat was readily available without [defendant] moving from his position on the seat." *Liss*, 406 Ill. at 422, 424. The majority relies on *Liss* to claim that "the State offered no evidence that Carpenter owned the car or that the firearm embedded within the car's seat was 'in such close proximity' that Carpenter could have readily used it." But neither ownership nor close proximity is necessary to prove constructive possession. Instead, the State must prove the defendant "had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People*

*v. Hunter*, 2013 IL 114100, ¶ 19; *People v. Davis*, 2021 IL App (3d) 180146, ¶ 72. Contrary to the majority's contention that "the State presented no evidence from which a rational trier of fact could reasonably infer that Carpenter knew the gun was present," the evidence, when viewed in the light most favorable to the prosecution—including Carpenter looking through the rear window multiple times and at the side of the vehicle as officers searched the driver's seat area, and Piechocki's testimony that Carpenter appeared nervous and that he felt a hard object underneath the driver's seat during his search—satisfies the knowledge requirement for constructive possession. *Cf. People v. Hampton*, 358 Ill. App. 3d 1029, 1033 (2005) (finding the evidence insufficient to prove defendant knew of the presence of a gun in the vehicle he was driving where uncontradicted evidence showed that the car belonged to defendant's deceased brother, defendant had driven the car only once, the gun was found inside a sock in the glove compartment so it "would not have been visible to defendant as he drove" and the State's evidence "proved little more than that defendant was in the car where the gun was found"). When the evidence is viewed in the light most favorable to the prosecution, I find it sufficient to support the trial court's conclusion that Carpenter constructively possessed the firearm that was recovered from driver's seat of the vehicle he was driving.

¶ 59    Because the evidence was sufficient to convict, I turn to Carpenter's second argument on appeal that his counsel was ineffective for withdrawing his motion to suppress the evidence recovered from his vehicle. Before trial, Carpenter's counsel filed a motion to quash arrest and suppress evidence, arguing that the stop of the vehicle, Carpenter's detention and arrest, and the ensuing search were illegal under the fourth amendment. As the court prepared to hold a hearing on Carpenter's motion, Carpenter's counsel indicated that after "discuss[ing] this with Mr. Carpenter[,] [h]e wishes to withdraw the motion to quash and suppress his traffic stop." The court

asked, "Is that what you wish to do Mr. Carpenter?" After Carpenter confirmed that he did, the motion was withdrawn.

¶ 60    Carpenter now argues that his trial counsel was ineffective for withdrawing the motion and that the motion would have been granted if it had been argued. The State argues that because Carpenter invited the error (*People v. Abston*, 263 Ill. App. 3d 665, 671 (1994) ("where the trial court's course of action is taken at defendant's suggestion and the defendant thereafter acquiesces in the court's expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal")), he cannot now claim that his attorney was ineffective for following his wishes.

¶ 61    To establish ineffective assistance of counsel, a defendant must prove that (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). "The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 62    To establish prejudice based on defense counsel's decision not to file a motion to suppress evidence, a defendant must show there is a reasonable probability that (1) the trial court would have granted the motion, and (2) doing so would have altered the outcome. *People v. Orange*, 168 Ill. 2d 138, 153 (1995). Assuming, without deciding, that Carpenter did not waive this issue, we cannot reach the merits of his ineffective assistance claim due to the insufficiency of the record.

¶ 63    In *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 16, the court found the facts insufficient to address the defendant's ineffective assistance of counsel claim based on defense counsel's

failure to file a suppression motion. The court pointed out that because probable cause was not an issue at trial, the State had no reason to demonstrate the factual basis that gave the officers probable cause to arrest defendant in the first place. *Id.* ¶ 11. The court concluded that the "[d]efendant has not and cannot meet his burden to show that he was denied the effective assistance of counsel absent him presenting evidentiary facts or the nonexistence of such facts pertaining to the officers' probable cause determination." *Id.* ¶ 18.

¶ 64 Similarly here, because there was no hearing on the motion to quash, and neither the prosecution nor defense counsel elicited any additional testimony at trial regarding the basis of the motion to quash, we cannot entertain Carpenter's ineffective assistance of counsel claim due to the dearth of facts in the record. See *People v. Williamson*, 2018 IL App (3d) 150828, ¶ 30 (declining to reach the merits of defendant's ineffective assistance of counsel claim because the record was "insufficient to determine whether the abandoned claim would have been successful had it been pursued at the suppression hearing"). As such, Carpenter's ineffective assistance of counsel claim is " 'better suited to collateral proceedings.' " *Id.* ¶ 29 (quoting *People v. Veach*, 2017 IL 120649, ¶ 46 (noting that ineffective assistance of counsel claims may be better suited to collateral proceedings "when the record is incomplete or inadequate for resolving the claim")); *Bew*, 228 Ill. 2d at 134 (same).

¶ 65 Because Carpenter's conviction should be affirmed, I respectfully dissent.

***People v. Carpenter*, 2024 IL App (1st) 220970**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-8498; the Hon. Michael Joseph Kane, Judge, presiding. |
| **Attorneys for Appellant:** | William P. Wolf, of Law Office of William Wolf, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and James J. Stumpf, Assistant State's Attorneys, of counsel), for the People. |